The STATE of Ohio, Appellee,

v.

DUNHAM, Appellant.

[Cite as *State v. Dunham* (1997), 118 Ohio App.3d 724.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–960462.

Decided March 19, 1997.

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *William E. Breyer,* Assistant Prosecuting Attorney, for appellee.

*Faulkner & Tepe* and *A. Norman Aubin,* for appellant.

*Per Curiam.*

This is an appeal from the judgment entered upon the verdict of the jury finding the defendant-appellant, Gayle Craig Dunham, guilty of felonious assault as he stood charged in the single-count indictment upon which the prosecution was based. After a presentence investigation was completed, the court sentenced Dunham to a term of six to fifteen years' imprisonment.

We are given this single assignment of error:

"Whether defendant-appellant, Gayle Craig Durham [*sic* ], should have been convicted of felonious assault, as defined by Ohio Revised Code § 2903.11(A)(1),

when it was a 'mutual consent' situation, and the testimony of the alleged victim was not credible of belief." [1]

The event underlying the charge that Dunham "knowingly caused serious physical harm to Alexander Hopkins, in violation of [R.C.] 2903.11(A)(1)" on October 22, 1995, had its origin in July 1995. On an unspecified day in that month, Alexander Hopkins, then sixteen years of age, was carrying $310 in currency which belonged to his employer. Hopkins testified that Dunham hit him in the left eye "with some kind of metal, possibly * * * brass knuckles" and "robbed" him of the money. Apparently charges against Dunham were filed, but the record is unclear as to their disposition.

On October 22, 1995, sometime between noon and 2:00 p.m., Hopkins saw Dunham riding a moped on a public street as Hopkins was driving his car. Because he wanted to ask Dunham about the July incident, Hopkins turned his car around to approach Dunham but lost sight of him. Hopkins then drove past the home of one of Dunham's relatives, where he saw Dunham's moped parked. Before confronting Dunham, Hopkins enlisted the help of a friend and armed himself with what he termed a "crowbar," a metal device used in the changing of automobile tires, as a precaution "just in case something happened." Dunham approached Hopkins and instructed him to "put the crowbar down," and Hopkins threw it to the ground. When Dunham indicated he was calling "his boys" to be with him during the anticipated confrontation, Hopkins retrieved the tire tool, placed it in his car and drove to his home. Hopkins then returned on foot to the original scene, where he again found Dunham in the company of a sizeable group of his friends. An apparently smaller group of Hopkins's friends joined him. Dunham and Hopkins approached each other "with their hands up," and the anticipated fistfight began. During the melee, Hopkins "blacked out" as a consequence of a chokehold applied by Dunham. Hopkins testified that he remembered nothing else until he awakened in a hospital.

Hopkins described the injuries for which he was treated medically and surgically as trauma to his face that required the insertion of a metal plate in his cheek, damage to an eye, swelling of his face, a broken nose, "tearing" of his skin and damage to his lips. He testified as to the necessity of additional surgery and impaired vision.

During the fight, a police officer was dispatched to investigate because of the size of the crowd surrounding the scene. That group was so large that the

---

1. The defendant-appellant is referred to within the record as "Craig Dunham," and when he testified at trial he gave his name as Gayle Craig Dunham. There is no suggestion that any misidentification of him exists, and we therefore view the identification in the assignment as a typographical error.

officer, out of concern for his personal safety, waited for the arrival of support before intervening. When another officer arrived, they pushed through the crowd. One officer described what they found:

"A. He [Hopkins] was just laying there sort of in a fetal position, his face was all puffy, there was blood around his eyes, his one eye was swollen shut. At that time I requested a rescue unit to respond for an injury.

"Q. Did you see anyone else injured laying on the ground at that time?

"A. No.

"Q. You requested a life squad?

"A. Yes, I did.

"Q. Why did you request a life squad?

"A. Due to the injury of Alexander. Looked like a very serious injury."

Another police officer arrived at the moment Hopkins was being placed in an ambulance. He gathered information from his fellow officers and members of the crowd, who told him that after Hopkins fell to the ground, he "was stomped on the head" by Dunham. Dunham was placed under arrest, transported to a district police station, given his *Miranda* rights, and then questioned. At that time, Dunham had a small abrasion or scratch on his collarbone and an insignificant wound on the knuckles of his right hand, which appeared to be fresh. Dunham's statement to the police, in the officer's words, was, in significant part, as follows:

"He said he knew Alex from school, meaning the victim, Alexander Hopkins. Said they had some trouble between them in July which was still pending. He was visiting his godparents at 1511 California. He was riding a motor scooter, was on his way home on the scooter. Said Alex ran up with a crowbar, took a swing with a crowbar, striking him in the upper chest.

"He started screaming, he called his brother Mike at his house and told him that there was trouble. Alex and his friends were across the street. He waited for his brother to come from Snowhill, and that was Dontonio, and his brother showed up a little while later.

"The fight started. Shawn, who was later identified as Shawn Fears, hit Dontonio and brother Mike with a crowbar. He starts fighting with Alex. He said he did not have any type of weapon. Alex swung with a crowbar but missed, said he punched him and hit him in the face, grabbed him and choked him down, and hit him in the head a couple of times. Kicked him one time he thinks, in the chest, and he said he saw Shawn Fears hit his brother in the arm and hit Dontonio in the back with a crowbar.

"Q.  One part that you mentioned choking; is that correct?

"A.  That's correct.

"Q.  Who did he say who was choking who?

"A.  He was choking Alex."

The assignment of error, facially, raises the question of whether the verdict is against the manifest weight of the evidence.  The issue presented for review and argument adds another contention, which is that because both Dunham and Hopkins agreed to fight, in some undefined manner Hopkins's testimony that Dunham committed a felonious assault upon him became incredible.  Counsel for Dunham has given us no authority upon which to base that assertion, and the prosecutor has treated this appeal as one involving only a weight-of-the-evidence issue.

We begin our resolution of this appeal with an assumption that the appellant's theory of law is that where two people engage in a boxing match, a mutually agreed-upon fistfight, neither can claim that an assault and battery has been committed upon him, *i.e.*, neither possesses a criminal intent when battering his opponent.  We have found *Barholt v. Wright* (1887), 45 Ohio St. 177, 12 N.E. 185, to be instructive.

In *Barholt,* the plaintiff sought damages for an assault and battery committed upon him by the defendant, with whom he had fought by agreement.  The opinion by Justice Marshall begins with this observation:

"It would seem at first blush contrary to certain general principles of remedial justice to allow a plaintiff to recover damages for an injury inflicted on him by a defendant in a combat of his own seeking;  or where, as in this case, the fight occurred by an agreement between the parties to fight.  Thus in cases for damages resulting from the clearest negligence on the part of the defendant, a recovery is denied the plaintiff, if it appears that his own fault in any way contributed to the injury of which he complains." [2]  *Id.* at 178, 12 N.E. at 186.

The *Barholt* opinion goes on, however, to acknowledge that the same principles do not necessarily apply when an assault is considered in the context of a criminal prosecution rather than a civil action.  Justice Marshall refers in this respect to *Champer v. State* (1863), 14 Ohio St. 437, which states in terms laconic in the extreme:

---

**2.**  The opinion refers to the ancient maxim *volenti non fit injuria* (no legal wrong is done to him who consents), which is said to be the foundation of the doctrine of assumption of risk.

"Held, an indictment against A. for an assault and battery upon B., is not sustained by evidence that A. assaulted and beat B. in a fight at fisticuffs, by agreement between them.

"An assault and battery and an affray are distinct offenses under the statute, punishable by different penalties.

"Judgment reversed and cause remanded."

The view that the criminal law recognizes the wrongfulness of conduct that may not be civilly actionable is further developed in *Barholt* in this telling observation:

"[W]here two persons go out to fight with their fists, by consent, and do fight with each other, each is guilty of an assault, although there is no anger or mutual ill-will. *Champer v. State*, 14 Ohio St. 437, is not in conflict * * * ." *Barholt, supra*, 45 Ohio St. at 180, 12 N.E. at 187.

An assault, at common law, is the willful threat or attempt to harm or touch another offensively, coupled with a definitive act by one who has an apparent present ability to do the harm or to commit the offense of touching. 6 Ohio Jurisprudence 3d (1996), Assault–Civil Aspects, Section 3; *Smith v. John Deere Co.* (1993), 83 Ohio App.3d 398, 614 N.E.2d 1148. Under the Revised Code, the elements of felonious assault include the culpable mental state of knowledge, not purpose. *State v. Cooey* (1989), 46 Ohio St.3d 20, 25, 544 N.E.2d 895, 905. A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably be of a certain nature or will probably cause a certain result. R.C. 2901.22(B).

Except for exhibitions of boxing by professional and amateur fighters held pursuant to R.C. 3773.31 *et seq.*, fighting must be held to be illegal in this state because each combatant may be guilty of an assault in law as well as the battery which might follow as a consequence of the exchange of blows or, at least, by the demonstration of the ability to do harm. The fact that street fighters agree to engage in a public brawl to settle old or current differences cannot and does not negate the penal consequences. It follows, then, that when Hopkins and Dunham confronted each other with fists raised ready to fight, both were equally guilty of an assault.

However, what occurred thereafter is what brings this case within the purview of R.C. 2903.11(A)(1), which provides:

"(A) No person shall knowingly:

"(1) Cause serious physical harm to another * * *."

Our review of the record convinces us that no reasonable mind could conclude other than that Hopkins suffered serious physical harm. The photographs of

Hopkins's appearance immediately after the brawl, introduced as evidence in the trial, demonstrate conclusively the severity and the probable permanent effects of the trauma inflicted upon him by Dunham after Hopkins fell unconscious to the ground and was kicked and "stomped" upon his head, face and neck, while defenseless.

Therefore, we hold that Dunham's assignment of error is not well taken. We hold that where, as here, two persons agree to fight each other not in conformity with statutes authorizing boxing matches, each may be held guilty of assault, and where, as here, the harm visited upon one of the fighters constitutes serious physical harm, the fact that the fight was begun by mutual consent is not a defense, in law, to a charge brought pursuant to R.C. 2903.11(A)(1).

The question of whether the verdict is against the manifest weight of the evidence must also be resolved against Dunham. In reviewing the manifest weight of the evidence, an appellate court reweighs the evidence and assesses the credibility of the witnesses, and determines whether the jury lost its way and created a manifest miscarriage of justice. *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717. The United States Supreme Court has described the difference between a review of weight, as opposed to a review of sufficiency, of the evidence as determining the minimal amount of evidence necessary to support a guilty verdict versus a limited reweighing of the evidence as "a thirteenth juror." *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652, 661. Judged by either standard, the evidence in this record supports Dunham's conviction.

For the reasons given above, the assignment of error is overruled, and the judgment of the Hamilton County Court of Common Pleas is affirmed.

*Judgment affirmed.*

GORMAN, P.J., SUNDERMANN and SHANNON, JJ., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.