The STATE of Ohio, Appellee,

v.

GUIDUGLI, Appellant.

[Cite as *State v. Guidugli*, 157 Ohio App.3d 383, 2004-Ohio-2871.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–030568.

Decided June 4, 2004.

384

Kenneth B. Baylen, for appellee.

Mary Jill Donovan, for appellant.

GORMAN, Judge.

{¶ 1} Viewed narrowly, this appeal presents a simple question: whether the trial court erred by convicting the defendant-appellant, Gino Guidugli, of misdemeanor assault, in violation of R.C. 2903.13(A), for his role in a scuffle that broke out between members of opposing teams after a hard foul in a closely contested intramural basketball game at the University of Cincinnati. Viewed broadly, this appeal presents a far more complex social issue involving the wisdom of strictly applying the criminal law to physical altercations that arise within the context of sports contests, especially those contests that are already subject to league regulation and internal discipline—and particularly where the bodily injury to the alleged victim is not serious.

{¶ 2} Unfortunately, the larger social question is not directly addressed by the legal issues presented on appeal, which concern only the sufficiency of the

evidence and the competency of counsel in presenting Guidugli's unsuccessful claim of self-defense. Although questioning the necessity of prosecuting as a criminal offense what may have been dealt with internally by the university, and the harshness of the sentence imposed by the trial court, we are unable to find any reversible legal error. As a court of law, not of social policy, we affirm.

## A HARD FOUL IGNITES A FIGHT

{¶ 3} On March 9, 2003, Guidugli, the starting quarterback for the University of Cincinnati football team, was playing in an organized student intramural basketball game at the Armory Field House on the University of Cincinnati campus. When Guidugli's teammate protested a foul called by the referee, his teammate and an opposing player exchanged heated words, and the opposing player grabbed his teammate by the shirt. Both benches emptied as players took to the floor.

{¶ 4} There was conflicting testimony regarding the nature of the ensuing scuffle. Keith Steineman, the intramural supervisor, described it as a "fracas" involving "pushing and shoving." He stated that supervisors were trained to "let players like work it out themselves so we don't get involved and get hit." Steineman testified, though, that the only punch he saw thrown was that by Guidugli. But one of Guidugli's teammates, Doug Monaghan, testified that the pushing and shoving quickly escalated into a donnybrook. In his words, "fists were flying."

{¶ 5} According to Steineman, he witnessed Guidugli enter the fracas, and it was his opinion that Guidugli was, initially at least, "trying to break up [the] scuffle." But he then saw Guidugli knock over one of the opposing players, Levi Harris, and "punch him with a full swing" around the eye. Chris Brunswick, who was acting as scorekeeper, testified that he thought Harris was already on the ground when Guidugli ran onto the court and punched him. Guidugli, however, testified that he was one of the players on the floor and had taken a position along the foul lane, getting ready for the foul shots, when the fight broke out. He stated that he saw another teammate of his, Kevin Hazel, punch Harris, and that he was pulling someone off Monaghan when he saw a punch coming in his direction out of the corner of his eye. He stated that when he turned around, he recognized the person attempting to throw the punch as Harris and he "just defended himself."

{¶ 6} Whatever the degree of the fight, Steineman testified that afterward the teams "worked it out" and order was restored. Guidugli's team was told, apparently by Steineman, that they had forfeited the game and should leave the gym, which they did.

{¶ 7} The university police were called after Steineman reported the "group fight" by radio to the main office. Officer Kevin Manz arrived two minutes after being dispatched, but some 30 to 45 minutes after the incident. Although Guidugli and his team had left, Harris and his team had remained because they had another game. Officer Manz spoke to Harris, who was holding a wet cloth to the area around his left eye. Officer Mainz took photographs of Harris's face. Harris then signed a complaint charging Guidugli with criminal assault. Harris's affidavit accompanying the complaint stated, "As I was walking away I was hit with two punches, one from the side and one from the back. I was unaware who hit me."

{¶ 8} Harris, it must be noted, failed to appear at trial. According to the prosecution, Harris was living in Columbus and was unable to leave work to attend the proceeding.

{¶ 9} The trial court, upon hearing all of the various versions of the fight and punch, rejected Guidugli's claim of self-defense, stating that the evidence showed that he had punched Harris in retaliation rather than to protect himself. The court thus convicted Guidugli of misdemeanor assault. After listening to arguments in favor of mitigation made by Guidugli's trial counsel, the court imposed a 180–day jail sentence, which it then suspended in favor of one year's probation with the conditions that Guidugli undergo 60 days of home incarceration using an electronic monitoring unit, and that he participate in any treatment or counseling, including anger management, recommended by the probation department. Further, Guidugli was required to pay a $100 fine and court costs.

{¶ 10} On July 3, 2003, Guidugli, represented by new counsel, filed a written motion to mitigate, requesting the court to reconsider its sentence. In his motion, Guidugli asked the court to sentence him to community service only, asserting that the incident that had led to his conviction was an isolated event in which he had allowed his competitive nature to interfere with his better judgment. He claimed that he deeply regretted his behavior and had learned a valuable lesson that would preclude him from ever committing a similar offense. In support of his character, he pointed out that he had been a law-abiding citizen for the first 20 years of his young life and had maintained a grade point average of 3.27 as a business-management major at the University of Cincinnati while maintaining the rigorous schedule of a college athlete. He also pointed out that he had been an active member of CPAWS, a student-athlete group that took part in service projects throughout the greater Cincinnati area, and that he had voluntarily spoken at numerous fundraisers and had traveled to Mississippi Gulf Coast Community College to work as a camp counselor for disadvantaged children. He also observed that the sentence as imposed by the trial court had forced him to cancel plans to attend the Peyton Manning Sports Camp, and that

it threatened his participation in certain media events important in garnering awards during the college football season, as well as his presence at a team training camp considered integral in preparation for the first game of the season.

{¶ 11} On July 7, 2003, the trial court denied the motion. On August 14, 2003, the trial court granted Guidugli's motion to stay further execution of the sentence pending this appeal.

## SUFFICIENCY OF THE EVIDENCE

{¶ 12} In his first assignment of error, Guidugli argues that the evidence presented by the state in its case-in-chief was insufficient to convict him of assault, and that therefore the trial court committed error by overruling his Crim.R. 29 motion for a judgment of acquittal at the conclusion of the state's case. We disagree.

{¶ 13} A motion for a judgment of acquittal should not be granted when reasonable minds can reach different conclusions as to whether each element of the crime charged has been proved beyond a reasonable doubt. See Crim.R. 29; see, also, *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus. Here, Guidugli argues that the state did not sustain its burden of proof because the evidence did not (1) specifically identify him as the person who struck Harris, (2) establish that he acted knowingly, (3) demonstrate any physical harm to Harris, and (4) identify Harris as the victim of the assault.

{¶ 14} Because the case was tried to the bench, it was unnecessary for Guidugli to have renewed his Crim.R. 29 motion at the close of all of the evidence. *Dayton v. Rogers* (1979), 60 Ohio St.2d 162, 14 O.O.3d 403, 398 N.E.2d 781. But this court follows the rule that a defendant who presents evidence and testifies in his defense waives his right to challenge the sufficiency of the evidence at the close of the state's case. *State v. Erwin* (Feb. 24, 1993), 1st Dist. No. C–920293, 1993 WL 50944; accord *State v. Jenkins* (1991), 75 Ohio App.3d 63, 68, 598 N.E.2d 872 (Fourth Appellate District); *State v. Higgins* (1990), 61 Ohio App.3d 414, 418, 572 N.E.2d 834 (Tenth Appellate District).

{¶ 15} The Second Appellate District, it should be noted, has concluded that a defendant who presents evidence does not waive his right to argue on appeal that the trial court erred by overruling his Crim.R. 29 motion at the close of the state's evidence. *State v. Parks* (1990), 56 Ohio App.3d 8, 9–10, 564 N.E.2d 747. *Parks* was based on the Ohio Supreme Court's holding in *Helmick v. Republic–Franklin Ins. Co.* (1988), 39 Ohio St.3d 71, 529 N.E.2d 464, that a defendant in a civil case does not waive a claim of error by presenting evidence after the denial of a motion for a directed verdict pursuant to Civ.R. 50(A)(2). The Second Appellate District in *Parks* concluded that there was no reason to treat criminal

and civil defendants differently. The rule in *Parks* has been subsequently cited with approval, but without analysis, in *In re Lipford* (Dec. 24, 2001), 7th Dist. No. 01 AP 756, 2001 WL 1667861; *State v. Brown* (1993), 90 Ohio App.3d 674, 685, 630 N.E.2d 397 (Eleventh Appellate District); *State v. Bidinost* (Jun. 17, 1993), 8th Dist. No. 62925, 1993 WL 215454; *Matter of Resor* (June 12, 1992), 6th Dist. No. H–91–34, 1992 WL 131476; *State v. Stone* (Mar. 26, 1992), 4th Dist. No. 90 CA 23, 1992 WL 56778; and *State v. Johnson* (Jan. 8, 1992), 9th Dist. No. 2659, 1992 WL 2922.

{¶ 16} Notwithstanding *Parks* and its progeny, we continue to adhere to our own rule in *Erwin*. The Ohio Supreme Court's holding in *Helmick* was based, in part, upon Civ.R. 50(A)(2). That rule states that "[a] party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event the motion is not granted * * * to the same extent as if the motion had not been made * * *." Crim.R. 29 contains no parallel provision. Furthermore, the court in *Helmick* reasoned that there was no logic in a rule that forces a civil defendant to rest at the close of the plaintiff's case-in-chief and risk an adverse verdict in order to preserve error. But the same reasoning does not apply to a criminal case. Unlike a civil case, the state may not depose the defendant or call the defendant as a witness as on cross-examination in its case-in-chief. The Fifth Amendment to the United States Constitution guarantees that a defendant charged with a crime may refuse to testify or otherwise to present a defense. But if, as here, the criminal defendant does take the stand to assert a defense such as self-defense, in which he essentially admits his guilt absent a finding of justification, there is absolutely no logic or justice in a rule that would require an appellate court to reverse his conviction because of the insufficiency of the evidence before he testified. Such a rule could theoretically allow murderers to go free on records that conclusively establish their guilt.

{¶ 17} We raise this point because Guidugli's arguments concerning the sufficiency of the evidence are directed solely to the state's case. Under *Erwin*, however, his decision to go forward with a defense waived such an argument. We note, though, that, even if we ignore Guidugli's defense in which he admitted striking Harris, the state offered sufficient direct and circumstantial evidence in its case-in-chief to convict Guidugli of misdemeanor assault. "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. An inference has been defined as "a conclusion which, by means of data founded upon common experience, natural reason draws from facts which are proven." *State v. Nevius* (1947), 147 Ohio St. 263, 34 O.O. 210, 71 N.E.2d 258. An inference may be based in part on another inference, so long as that inference is

also supported by other independent facts from the direct evidence. *State v. Palmer* (1997), 80 Ohio St.3d 543, 561–562, 687 N.E.2d 685. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks,* supra, at paragraph two of the syllabus.

{¶ 18} In the state's case-in-chief, both Steineman and Brunswick testified that they saw Guidugli punch the victim in the face with such force that one could reasonably infer intent to inflict physical injury. Steineman described the force as "pretty good," and Brunswick testified that Guidugli "wound up" before delivering the punch. A person is presumed to intend the natural consequences of his actions, and, therefore, the trial court was entitled to infer that Guidugli, by landing a forceful punch just beneath Harris's eye, intended to do more than just temporarily distract his attention. As for the state's evidence establishing the victim's identity, Officer Manz testified that he spoke to the victim, who was holding a wet towel to his face, upon arriving at the basketball court. Officer Manz identified the man he spoke to as Levi Harris, and he then presented photographs, which were admitted as exhibits, of Harris's injured face. We have examined these black-and-white photographs independently, and although Harris's eye does not appear to have sustained any injury, there is a barely noticeable swelling underneath the left socket, which, though appearing anything but serious, could be perceived by the trier of fact as a minor welt. Accordingly, it was reasonable for the trial court to conclude at the close of the state's case that Guidugli had knowingly caused or attempted to cause Harris physical harm, which R.C. 2901.01(A)(3) defines as "*any* injury, illness or other psychological impairment, *regardless of gravity or duration.*" (Emphasis added.) Guidugli added to this evidence by testifying only after his motion for acquittal was denied. In his testimony, Guidugli admitted striking Harris with a punch. He testified that during the melee he saw a punch coming from his backside, and upon seeing a person he identified by name as Harris, he turned to defend himself by throwing a retaliatory punch.

{¶ 19} Guidugli's first assignment of error is overruled.

## INEFFECTIVE ASSISTANCE OF COUNSEL

{¶ 20} In his second assignment of error, Guidugli asserts that he was denied the effective assistance of trial counsel as guaranteed by the Sixth Amendment. Specifically, he alleges that his trial counsel was ineffective by failing to (1) adequately present a theory of self-defense, (2) request a jury trial, (3) subpoena necessary witnesses, (4) adequately request discovery, (5) prepare him to testify,

and (6) competently argue his case in closing. We discern nothing in the record to support any of these alleged failings.

### Standard of Review

{¶ 21} In order to demonstrate ineffective assistance of counsel, Guidugli must show both that his trial attorney's performance was so deficient that it violated a substantial duty, and that he was prejudiced thereby. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, certiorari denied (1990), 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 768; *Lockhart v. Fretwell* (1993), 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180; *State v. Powell* (1993), 90 Ohio App.3d 260, 629 N.E.2d 13. In order to establish prejudice, Guidugli must show that his trial attorney's errors were "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Fretwell,* supra, 506 U.S. at 369, 113 S.Ct. 838, 122 L.Ed.2d 180, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. "Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *United States v. Cronic* (1984), 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657.

### 1. *Trial Preparation*

{¶ 22} Guidugli does not identify what discovery materials or eyewitness testimony was not procured but asks us merely to presume that further discovery could have been made, or that somewhere among the many eyewitnesses to the basketball game someone may have seen something that might have aided in his defense—and would have shown up at trial to testify. Similarly, he asks us to assume that his chances of an acquittal would have been greater before a jury than before the judge who presided over the case. He asks us also to suppose that his trial counsel's pretrial discussions with him were inadequate, although there is nothing in the record about what those discussions might have been. A claim of ineffective assistance of counsel, however, requires more than just supposition. Indeed, to the extent that the law engages in assumptions regarding the performance of trial counsel, they are all to be drawn in favor of competency, not against it. In determining whether trial counsel's performance was deficient, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* supra, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

### 2. *Closing Argument*

{¶ 23} In closing argument, defense counsel attacked the testimony suggesting that Guidugli was the only one to resort to the use of his fists. He pointed out that the fight had been reported to the university police as a "group fight," a characterization that, he argued, was consistent with the defense

witnesses who described the scuffle as a donnybrook with fists "flying all over the place." In this context, defense counsel sought to portray Guidugli as initially a peacemaker who got suddenly and unintentionally drawn into the battle when he detected a punch coming in his direction and responded instinctively by throwing a preemptive first punch. He argued forcefully that such a blow was justified and that the law did not require Guidugli to absorb a punch before throwing one at his attacker.

{¶ 24} These arguments were clearly cogent and supportive of Guidugli's claim of self-defense. They were not incompetent or ineffective. Concededly, at one point defense counsel stated that Guidugli's punch was thrown in "retaliation," but when the remark is considered in context, it is clear that he did not mean to imply that the punch was gratuitous. The thrust of his argument was that the punch was thrown to ward off another blow.

### 3. *Other Available Defenses—Sports Violence and the Criminal Law*

{¶ 25} In mitigation, in other words after the trial court's finding of guilt, defense counsel raised the argument for the first time that such fights were typical of hard-fought athletic contests, particularly among young college-aged men eager to test their manhood. As defense counsel pointed out, "[Y]ou don't have to go any further than Riverfront Stadium to see athletes in altercations." Defense counsel asked that the trial court take into consideration that "this young man [Guidugli], like all the other guys who are out there that night, were competitors and in a game. And the game got a little out of control at a point. And it escalated into this * * *."

{¶ 26} This argument brings into focus the larger question alluded to at the outset of this opinion: whether physical altercations arising in sports contests that are already subject to some form of internal regulation and discipline should necessarily result in criminal charges, at least where there are no serious physical injuries as a result. Legal scholars have questioned the strict application of the criminal law to sports contests in which, contrary to real-world norms that generally condemn such behavior, a premium is placed upon physical aggression, intimidation, and enforcement. See, e.g., Clarke, Law and Order on the Courts: The Application of Criminal Liability for Intentional Fouls During Sporting Events (2000), 32 Ariz.St.L.J. 1149; Harary, Aggressive Play or Criminal Assault? An In Depth Look at Sports Violence and Criminal Liability (2002), 25 Colum.J.L. & Arts 197.

{¶ 27} "From an early age, athletes are taught to intimidate opponents and to precipitate physical altercations rather than to avoid them. Athletes learn that they need to be tough to get noticed and to excel in higher levels of competition." Clarke, supra, 32 Ariz.St.L.J. at 1157–1158. "Violence in sports can be attributed

to many factors, including: the interplay between competition, frustration, and aggression; the 'game reasoning' or 'sport reasoning' that supplements—or, at times, replaces—ordinary moral reasoning during sporting events; the degree of 'sport socialization' that leads players to perceive sports violence as legitimate; *the sports norm of reciprocity for acts of aggression by opposing players;* and the significance placed upon winning at all costs. It is the confluence of these factors that create[s] the curious world which is sports—a world in which real world behavioral models have no place." (Emphasis added.) Id. at 1155–1156.

{¶ 28} Given the unique social dynamic involved in sports, "[c]riminal prosecution of sports participants for conduct that occurs with the playing of the game is rare." Id., 32 Ariz.St.L.J. at 1168, citing Yasser, Mcurdy & Goperlud, Sports Law (1990) 378. Most prosecutions, not surprisingly, have involved hockey games. See Calvert–Hanson & Dernis, Revisiting Excessive Violence in the Professional Sports Arena: Changes in the Past Twenty Years? (1996), 6 Seton Hall L.Rev. 127, 138. Perhaps saying something about the American competitive nature, prosecutors in the United States have shown far less zeal in punishing sports violence than their Canadian counterparts, who have been observed to use the criminal law much more frequently. See White, Sports Violence as Criminal Assault: Development of the Doctrine by Canadian Courts (1986), 1986 Duke L.J. 1030, 1034.

{¶ 29} One stated rationale for prosecutorial restraint is the inherent safeguards of league play, with its system of in-game punishment and suspension. As one commentator has written, "It is inevitable that players' passions will at times be aroused, but game officials and coaches are vested with the authority to impose sanctions for misconduct during the game. The penalties imposed by referees or umpires may seem minor when compared to those imposed on perpetrators of the same conduct outside the sport context, but those punishments are quick and certain, and are thought by some criminologists to be more effective in deterring undesirable behavior than the imposition of more severe penalties." Clarke, supra, 32 Ariz.St.L.J. at 1192.

{¶ 30} Here, the case proceeded in municipal court based upon the complaint of Harris, and as we understand the procedures in that court, such cases are not normally subjected to a decision whether to prosecute. Given that a criminal complaint was filed and the matter brought to trial, rather than handled within the internal disciplinary procedures of the university and its intramural sports program, the only defense readily available to Guidugli in a court of law was self-defense, which his attorney unsuccessfully yet competently argued.

{¶ 31} The only other argument that Guidugli's trial counsel could have conceivably made was one invoking the doctrine of implied consent. The doctrine, which has found some traction in criminal prosecutions of sports

violence, is best summarized as follows: "Generally, consent to violent acts capable of producing serious injury will not aid the attacker in avoiding criminal prosecution. However, participation in a sport provides automatic consent to certain contact encountered during the usual course of competitive athletic events, even if that contact can, or does, produce a serious injury. The rationale behind this doctrine is that when the victim consents to participating in a particular sport, he or she then consents by the very nature of the sport to certain acts of aggressive contact." Harary, supra, 25 Colum.J.L. & Arts at 205.

{¶ 32} Canadian courts were among the first to establish the implied-consent doctrine of sports in criminal cases, see *Regina v. Green* (Ontario Provincial Ct.1970), 2 C.C.C.2d 442; and *Regina v. Maki* (Ontario Provincial Ct.1970), 1 C.C.C.2d 333, but, interestingly, the American Law Institute had earlier adopted the doctrine in its 1962 Official Draft of the Model Penal Code. Section 2.11(2) of the code provides that consent can be an absolute defense to bodily harm if "the conduct and the harm are a reasonably foreseeable hazard of joint participation in a lawful athletic competition or competitive sport * * *."

{¶ 33} The Model Penal Code section has no analog in the Ohio Revised Code. As a matter of decisional law, the doctrine, although acknowledged, has found limited application in American courts. See *State v. Floyd* (Iowa App.1990), 466 N.W.2d 919, 922; *People v. Freer* (1976), 86 Misc.2d 280, 381 N.Y.S.2d 976, 979; and *State v. Shelley* (1997), 85 Wash.App. 24, 929 P.2d 489, 493. Courts have appeared to draw the line between physical aggression that can be reasonably foreseen within the context of game play, and, thus, by inference, consented to by the player, and violence that takes place after play has stopped, or is purely retaliatory, or exceeds in brutality or degree of injury anything that the player might have otherwise agreed to. For example, in *Floyd* the court refused to apply the doctrine to a recreational basketball game in which the defendant assaulted players resting on the sideline during a timeout. In *Freer*, the court held the doctrine inapplicable to a punch thrown by a football player in retaliation for a punch thrown by the complainant in the midst of a game tackle. And in *Shelley* the court refused to allow the doctrine to justify a punch thrown by another recreational basketball player who felt the blow was justified after the complainant had scratched him across the face during play.

{¶ 34} Our research has not disclosed any Ohio cases involving application of the implied-consent doctrine in a criminal prosecution for sports violence. In *State v. Dunham* (1997), 118 Ohio App.3d 724, 693 N.E.2d 1175, this court rejected application of the doctrine of mutual consent to a prosecution for felonious assault arising out of a street fight. In *Dunham*, we noted that the doctrine of mutual consent arose out of the ancient maxim *volenti non fit injuria* (no legal wrong is done to him who consents) that forms the basis in civil law of

the doctrine of assumption of the risk. Notwithstanding the survival of the Roman principle in the area of torts, we nonetheless concluded that, except for professional or amateur boxing exhibitions held pursuant to R.C. 3773.31, "fighting must be held to be illegal in this state because each combatant may be guilty of an assault in law as well as the battery which might follow as a consequence of the exchange of blows or, at least, by the demonstration of the ability to do harm. The fact that street fighters agree to engage in a public brawl to settle old or current differences cannot and does not negate the penal consequences." Id., 118 Ohio App.3d at 729, 693 N.E.2d 1175.

{¶ 35} Given its limited application, and our holding in *Dunham*, we cannot say that Guidugli's trial counsel was ineffective for not advancing the doctrine of implied consent as another affirmative defense. As noted, trial counsel appears to have argued the doctrine, in principle at least, during mitigation following the verdict, but not before. Even if we were to assume that the doctrine exists in Ohio, it is unlikely that the trial court would have found the doctrine applicable in this case. To have successfully argued the doctrine, Guidugli would have had to have persuaded the trial court that the punch he threw was a foreseeable part of the game and one to which Harris impliedly consented. Although it is specious to suggest that basketball remains today a noncontact sport, it is quite a stretch to argue that retaliatory punches during a pause in play are to be accepted as the unavoidable cost of playing the sport at the intramural level. It bears emphasis in this regard that the punch, as described by the state's witnesses, was entirely outside the scope of play and did not arise, for example, as a result of a scuffle under the basket or in a fight for a rebound.

{¶ 36} In sum, we find no deficiency in trial counsel's performance and no basis to assume that any defenses that he might have otherwise raised would have had any probability of altering the result of the trial, or cast doubt upon the fairness or reliability of the judgment reached. Accordingly, Guidugli's second assignment of error is overruled.

## OFFICIAL'S TIME OUT

{¶ 37} Finally, we observed earlier that the trial court imposed a 180–day suspended jail sentence, 60 days of home incarceration/electronic monitoring in lieu of the suspended sentence, one year of probation, anger-management counseling as recommended by the probation department, a $100 fine, and court costs—all for a minor welt in a basketball game suffered by a complainant who could not leave work to attend the trial. Later, the trial court denied a motion to reconsider its sentence despite several cogent arguments advanced by new counsel. Although the sentence may appear harsh, it has not been challenged on appeal and is not in any case subject to review. Guidugli, as the starting

quarterback on the University of Cincinnati football team, can now serve the balance of his sentence before fall practice and the upcoming season begins.[1] As Clarke notes, "Accountability among athletes is avoided by the simple expedient of ignoring anything but the on-court consequences of behavior." Clarke, supra, 32 Ariz.St.L.J. at 1156. At the very least, it seems, among the lessons learned from this case is that while sports norms may be very different from real-world norms, conduct on the court may still have very serious real-world consequences off the court.

{¶ 38} The judgment of the trial court is affirmed.

Judgment affirmed.

HILDEBRANDT, P.J., concurs.

SUNDERMANN, J., concurs in judgment only.

---

1. We note parenthetically that anger-management counseling may be counterproductive for a starting quarterback having to compete at the NCAA Division I–A level.