[Cite as *State v. Morales*, 2022-Ohio-4772.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                   Court of Appeals No.  L-22-1013

    Appellee                              Trial Court No.  CR0202001641

v.

Lorenzo Morales                              **DECISION AND JUDGMENT**

    Appellant                             Decided:  December 29, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**ZMUDA, J.**

{¶ 1} Appellant, Lorenzo Morales, appeals the judgment of the Lucas County

Court of Common Pleas, sentencing him to an aggregate prison term of 18 years to life

following a jury trial.  For the reasons that follow, we affirm.

# I. Background

{¶ 2} On the afternoon of August 16, 2019, police responded to the report of a death at 238 Field in Toledo, Ohio. Appellant's son, Bryan Morales-Rivero, went to the home to check on E.S. at appellant's request, after she failed to show up for work. Bryan found E.S., bloody and laying over the threshold between the kitchen and dining room. He called for help, prompting a passerby to phone 911. Police determined E.S. had been murdered.

{¶ 3} After a lengthy investigation, the state charged appellant in connection with the murder.

{¶ 4} On May 7, 2020, the state indicted appellant for murder in violation of R.C. 2903.02(A) and 2929.02 in Count 1; murder in violation of R.C. 2903.02(B) and 2929.02 in Count 2; and felonious assault in violation of R.C. 2903.11(A)(1) and (D) in Count 3, with a firearm specification as to each count pursuant to R.C. 2941.145(A), (B), (C), and (F).[1]

{¶ 5} The matter proceeded to a jury trial on November 15 through November 22, 2021. The only contested issue at trial was the identity of the assailant.

---

[1] At trial, brief reference was made to the fact that appellant's son, Bryan Morales-Rivero, was charged with obstructing justice. Bryan did not testify at trial, and while appellant attempted to implicate Bryan in the murder, the jury heard no testimony and viewed no evidence related to Bryan's role in the crime.

2.

{¶ 6} At trial, the state presented testimony of E.S.'s family, a former co-worker, and a pastor, as well as testimony of the police, investigators, and forensic experts. Appellant presented testimony of his brother, sister-in-law, and a co-worker at the restaurant. Appellant also testified on his own behalf. The testimony and evidence demonstrated the following facts.

{¶ 7} Appellant and E.S. had been together almost 14 years, and although they never married, they owned businesses together, a restaurant and a store in Toledo's South End. As business partners, they purchased a life insurance policy, and appellant and E.S. were each named as the other's beneficiary. Appellant lived at the home at 238 Field with E.S. and her three teen-aged children from a prior relationship. On the day of the murder, E.S.'s children were vacationing with family in Florida. Appellant's adult son, Bryan, also stayed with the couple.

{¶ 8} E.S. typically began each day at the restaurant, reporting at 8:00 a.m. to prepare for opening. The witnesses, including appellant, described E.S. as a hard worker. After checking in, she ran errands to the bank and to the store for supplies, then returned to help with the lunch rush. While she often relieved appellant at the store, appellant was primarily responsible for that business and he limited his participation at the restaurant to business decisions. The restaurant served alcohol and held dances, over E.S.'s objections, because appellant believed those activities to be profitable for the restaurant. When he did come to work with E.S., appellant followed E.S. or watched her as she worked.

3.

{¶ 9} Every other week, appellant and E.S. were responsible for opening the store they co-owned with appellant's brother and sister-in-law. Because it was appellant's and E.S.'s week, appellant reported to the store around 8:05 a.m. on the morning of the murder. Appellant's brother and sister-in-law testified that it was not unusual to open the store a few minutes late. Bryan was scheduled to work at the couple's restaurant that day, and he arrived to work just after 8:20 a.m.

{¶ 10} Appellant expected E.S. to relieve him at the store around 10:00 a.m., so he and his sister-in-law could keep an appointment with the insurance agent. When E.S. did not show, appellant began calling her phone, with no answer. He called his son at the restaurant to find out where E.S. was, and at first, Bryan indicated he was too busy to check on E.S. At the time, appellant had an app on his phone that linked to the restaurant's security camera, and he admitted looking at the footage to confirm Bryan's claim that he was too busy to help.

{¶ 11} By the afternoon, appellant had still not heard from E.S. At appellant's request, Bryan left the restaurant to go home and check on her. Upon arriving, Bryan found E.S. and called his father, indicating E.S. was on the kitchen floor and there was blood. According to appellant's brother, appellant called him and told him E.S. was dead, based on Bryan's phone call, and then appellant locked up the store and headed home. However, appellant's account of how he learned of the death differed. He stated he did not know E.S. was dead until he arrived at the scene.

4.

{¶ 12} By the time police arrived, appellant was on the scene and standing outside the house, away from E.S.'s family members. Appellant appeared calm and emotionless to police, and although appellant's facial expressions suggested tears, his eyes remained dry. Because appellant indicated that he did not speak English well enough to communicate with police officers, they placed him in the back of a cruiser until an interpreter arrived.

{¶ 13} As police directed appellant to sit in the cruiser, he expressed concern for "why he was being separated [from other witnesses] and why he was being put into the police car." Officers noted that appellant did not express concern for E.S., and his attempts at crying appeared to be faked emotion. Appellant's demeanor at the scene was recorded on body-cam video, which was displayed to the jury.

{¶ 14} The home showed no signs of a forced entry, and the inside showed no signs of a struggle or fight. The home was generally neat, with items in their place, and police noted it appeared the floor around the dining room table was freshly mopped based on the position of the chairs, upside down on top of the table as done in a restaurant. Police located E.S.'s purse on a couch near the front door. The purse contained over $3,000.00 and her children's passports and birth certificates, supporting the conclusion that robbery was not the likely motive for murder.

{¶ 15} Police noted several stab wound to E.S.'s chest and head, accompanied by less blood than would be expected from head and chest wounds. Initially, it appeared E.S. had been stabbed to death, based on the visible stab wounds. E.S. had both shallow

5.

and deep stab wounds, along with fresh abrasions and contusions to her neck, face, knees, and hands, and numerous swabs were collected from the body for DNA testing. However, an autopsy revealed the cause of death as a single gunshot wound to the back that penetrated near the heart, puncturing the aorta where it connected to the heart.

{¶ 16} After E.S. was shot, and her heart stopped pumping blood, E.S. was stabbed 18 times in the head, neck, back, and chest. E.S. also had a fresh bruise on the side of her face and scratches on her neck. Appellant's DNA was recovered near these injuries, and also from under E.S.'s fingernails. Both E.S.'s blood and appellant's semen was detected from vaginal and anal swabs taken from E.S. Police recovered the bullet from E.S.'s chest, a second bullet from the bedroom floor, and a spent casing just outside the bedroom, in the front room of the house. No gun or knife was ever recovered and connected to the murder.

{¶ 17} Based on the scene, however, police determined the incident began in appellant's and E.S.'s bedroom and progressed to the kitchen prior to the time E.S. would have gotten dressed and ready for work at 8:00 a.m. They also concluded that after the gunshot to the back, the assailant stabbed E.S. from behind, then flipped her over and continued stabbing her in the chest, neck, and head. Police reached this conclusion based on the bullet found lodged in the bedroom, the location of the shell casing, and the location of E.S. toward the rear of the house, lying on her back between the dining room and kitchen near a blood smear that indicated her body was moved. E.S.'s cell phone was still plugged in at her bedside, and she was dressed in the boxer shorts and t-shirt she

6.

wore as pajamas.  Police also determined from the shell casing recovered that the bullet was fired from a gun too large for the ammunition, and the gun possibly jammed as a result, retaining the second shell casing.

{¶ 18} After interviewing E.S.'s family and co-workers, police believed appellant's motive was related to E.S.'s decision to leave him.  On the Tuesday before the murder, E.S. told her sister that appellant had grabbed her by the hair during an argument the day before, and that she was done with appellant and going to leave him and let him have all the property and businesses.  E.S.'s sister supported E.S.'s decision to leave.  She felt appellant was too controlling of E.S. because he had to know where she was and what she was doing all the time, and he caused E.S. to change the way she dressed and applied makeup.

{¶ 19} On that same day, E.S. contacted her brother's husband for help in leaving appellant.  Her brother-in-law agreed E.S. should come with the children and stay with him and her brother in Kentucky.  E.S. indicated that she just needed to return to the home to get her children's birth certificates and passports.  E.S. then reached out to a pastor she knew and asked for a ride to Kentucky.  At trial, the pastor testified that he could not drive E.S. that day, and E.S. indicated she would take the bus to Kentucky.  Her children were already with her brother.

{¶ 20} Appellant testified that he learned of E.S.'s plan to leave him, but claimed E.S. changed her mind after they talked.  E.S. did exchange Facebook messages with her brother-in-law in Kentucky on Wednesday, and told him she would not be coming, after

7.

all. Her message, however, did not indicate all was well with appellant. Instead, she referenced problems that she did not know how to solve, and stated she had to face what comes and not look for an easy way out.

{¶ 21} On Thursday, the restaurant closed early and E.S. and appellant attended a tasting event, organized by E.S., to try out new dishes for the menu. E.S.'s family noted that E.S. and appellant looked "serious" and it appeared they were having a fight. Appellant made a comment to E.S.'s sister that "there were people that did not love them," a comment that was puzzling because E.S. was a beloved member of the community and had no enemies.

{¶ 22} On Friday, E.S.'s sister was asked by their mother to check on E.S. because E.S. was not answering her phone. After several attempts to reach E.S. by phone, the sister called appellant, who bluntly told her that E.S. was dead. E.S.'s sister and other family went to the home to find out what happened, and they confronted appellant, asking what he had done to E.S. Appellant kept himself apart from the family after the murder, although he did permit E.S.'s family to hold novena prayers in the house after her death.

{¶ 23} Shortly after the funeral, appellant contacted his insurance agent and inquired about collecting the $100,000.00 life insurance policy for E.S. He listed the Field Street address as his home address, and witnesses indicated he appeared to continue living at the home for months after the murder, despite claiming an unknown assailant invaded the home to kill E.S. Because the insurance agent needed a death certificate to

8.

process the claim, appellant eventually hired an attorney to assist him in obtaining the death certificate. The claim was not paid to appellant prior to his arrest for the murder.

{¶ 24} A month after the murder, appellant asked for a return of the cash taken from the scene in E.S.'s purse. He collected the money from the police property room and asked no questions of the detective regarding the murder investigation at that time, or in the months following. After several months, police indicated appellant was a person of interest. Appellant then gave an interview to a local television station from his restaurant, announcing he was looking for information to help catch the murderer. After the interview, he contacted police again, not to inquire about the investigation, but to get a vehicle key fob that had been taken from the scene.

{¶ 25} By April 2020, police no longer had contact with appellant and appellant had moved from the house on Field. According to appellant's brother, appellant had moved in with him soon after the murder and appellant was overcome with grief. No other witness testified regarding such grief, and appellant acknowledged that he remained in the home for some time after the murder. Appellant testified that his lack of outward signs of grief was cultural, but other witnesses disputed this claim, indicating that others in the family cried and grieved publicly.

{¶ 26} In sum, the state presented evidence of appellant's controlling relationship and the recent incident of physical violence – the hair grabbing – during an argument on the Monday preceding the murder. E.S.'s sister testified that this incident led to E.S.'s attempt to flee to Kentucky and abandon the businesses she had worked so hard to

9.

establish. Additionally, the state presented testimony of a former cook, who witnessed an incident months prior to the murder in which appellant threatened to kill E.S. for wasting money after chastising her for discarding some rice. The threat shocked E.S., the cook, and appellant, based on the cook's testimony. Appellant denied he ever threatened or harmed E.S.

{¶ 27} The state also presented evidence of appellant's motive, arguing he was full of rage and did not want E.S. to leave him. He also quickly sought to collect the life insurance proceeds, and only showed concern for his own well-being and his property, including the cash from E.S.'s purse and a vehicle.

{¶ 28} In addition to motive, the state presented evidence establishing appellant was the only likely assailant. The attack began in the couple's bedroom before E.S. had gotten ready for work. A bullet was recovered from the bedroom, a shell casing from the area just outside the bedroom, and E.S. was stabbed, repeatedly, toward the rear of the home, just inside the kitchen. Because E.S. did not report to work until 8:00 a.m., and appellant admittedly left the home around that same time, the state introduced evidence placing appellant at the scene at the likely time of the attack.

{¶ 29} As evidence of appellant's culpability, the police who responded to the scene commented on appellant's odd demeanor, notable for his unusual lack of emotion or concern for E.S., his intimate partner of 14 years.

{¶ 30} In his own defense, appellant's evidence established he was at the store from just after 8:00 a.m. until he closed up the store in the early afternoon. He also

10.

presented testimony from a current cook, who testified that Bryan was also a cook and scheduled to arrive at the restaurant at 8:00 a.m. She further testified that the other cook, who witnessed appellant threaten to kill E.S. several months prior to E.S.'s death, had not worked at the restaurant in the months before the murder. As to appellant's motive, he claimed that E.S. handled the restaurant finances and routinely carried large amounts of money, and he acknowledged E.S.'s attempt to flee to Kentucky to live with her brother and his husband, but claimed E.S. was trying to escape her family, and not him.

{¶ 31} On the morning of the murder, appellant claimed he and E.S. slept in and had consensual sex, and he left the home around 7:40 a.m., leaving E.S. to continue sleeping in. Appellant testified that his son, Bryan, was still at the house when appellant left for work. When E.S. did not arrive at the store by 10:00 a.m., he started calling and sending text messages, admitting he could have used his app to view the restaurant surveillance cameras to see if she was there, but called Bryan, instead.

{¶ 32} The defense presented a theory of either a random assailant or Bryan as the culprit. In response to the appellant's theories, the state pointed to evidence demonstrating E.S. was trying to leave appellant and that only appellant had a reason to kill her. The state also pointed to evidence demonstrating only appellant's DNA was found on E.S., including DNA in areas of injury like the swollen face and the scratched neck. The state noted the progression of the attack from inside the couple's bedroom to the kitchen doorway, and the personal nature of the attack. Significantly, after E.S. had been shot, the attacker stabbed E.S. 18 times, with wounds inflicted first to E.S.'s back,

11.

and then after E.S. was flipped over, to her chest and head. Finally, the attacker left behind a significant sum of cash in E.S.'s purse, in clear sight near the front door.

{¶ 33} The jury returned a guilty verdict as to all counts and the attached specifications. The trial court continued the matter for sentencing. On December 13, 2021, the trial court noted appellant was found guilty of all three counts in the indictment, and after finding Counts 2 and 3 with their attached specifications were allied offenses and subject to merger pursuant to R.C. 2941.25, the trial court proceeded to sentencing as to Count 1 at the state's election. The trial court imposed a prison term of 15 years to life as to murder in violation of R.C. 2903.02(A) and 2929.02, an unclassified felony, and imposed a mandatory, consecutive term of three years for the attached firearm specification, pursuant to R.C. 2941.145.

{¶ 34} Appellant filed a timely appeal of this judgment.

## II. Assignments of Error

{¶ 35} In challenging the judgment, appellant asserts the following as error in his appeal:

FIRST ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN DENYING APPELLANT'S CRIM.R. 29 MOTION.

SECOND ASSIGNMENT OF ERROR: THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.

12.

{¶ 36} While each assignment of error addresses a different issue, for ease of discussion, we address the assignments of error together.

### III. Analysis

{¶ 37} At sentencing, the state elected to proceed to sentencing on Count one: murder in violation of R.C. 2903.02(A) and 2929.02, with a firearm specification pursuant to R.C. 2941.145(A), (B), (C), and (F). Appellant challenges both the sufficiency and the weight of the evidence to support the jury's verdict as to murder and the attendant firearm specification.

{¶ 38} To find appellant guilty of murder with a firearm specification, the jury had to find that appellant purposely caused the death of E.S., and that he had a firearm while committing the offense or used a firearm in the committing the offense. R.C. 2903.02(A); R.C. 2945.145(A). In this case, the state presented evidence that was legally sufficient and persuasive as to the required elements.

{¶ 39} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Sufficiency pertains to the "legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Id.,* quoting Black's Law Dictionary 1433 (6 Ed.1990); Crim.R. 29(A).

{¶ 40} In reviewing the evidence for sufficiency, we construe the evidence most favorably for the state and determine whether "any rational trier of fact could have found

13.

the essential elements of the crime proven beyond a reasonable doubt." *State v. Walker,* 2021-Ohio-3860, 180 N.E.3d 60, ¶ 63 (6th Dist.), quoting *State v. Smith,* 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). Sufficiency is a test of adequacy, or whether the evidence is adequate to sustain the verdict as a matter of law. *Thompkins* at 386

{¶ 41} In contrast, the weight of the evidence pertains to "'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Id.* at 387, quoting Black's at 1594. If we find the evidence sufficient, we "may nevertheless conclude that the judgment is against the weight of the evidence." (Citation omitted) *Id.* at 387.

{¶ 42} To reverse based on the weight of the evidence, we must find, sitting as a "thirteenth juror," that the jury lost its way in resolving conflicts in the testimony. (Citation omitted) *Id.* The party having the burden of proof is entitled to their verdict if the greater amount of credible evidence weighs in their favor on the issues. "Weight is not a question of mathematics, but depends on its *effect in inducing belief.'"* (Emphasis sic.) *Id.,* quoting *Black's* at 1594.

{¶ 43} Appellant first argues that the trial court erred in denying his Crim.R. 29 motion for acquittal based on sufficiency of the evidence on all essential elements of the offense of murder with a firearm specification. Specifically, appellant argues that there was *reasonable doubt* because the state's case relied on only circumstantial evidence to prove he was the murderer, leading to the jury impermissibly stacking inferences. The

14.

state presented no eye-witnesses, no murder weapon, and found no blood from E.S. on appellant or in his car or any incriminating evidence on appellant's cell phone.

{¶ 44} In viewing the evidence, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks,* 61 Ohio St.3d 259, 272, 574 N.E.2d 492(1991), *superseded by constitutional amendment on other grounds as stated in State v. Smith,* 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4 (additional citation omitted.). Thus, regardless of whether the evidence is circumstantial or direct, "an appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." (Citation omitted) *Id.* Appellant acknowledges the equal weight of circumstantial and direct evidence, but argues that with no direct evidence, the jury based its verdict on "unsupported inferences stacked upon inferences."

{¶ 45} Appellant misconstrues "inference," and the law related to stacking an inference upon another inference. "An inference has been defined as 'a conclusion which, by means of data founded upon common experience, natural reason draws from facts which are proven.'" *State v. Guidugli,* 157 Ohio App.3d 383, 2004-Ohio-2871, 811 N.E.2d 567, ¶ 17 (1st Dist.), quoting *State v. Nevius*, 147 Ohio St. 263, 71 N.E.2d 258 (1947). There must be proven facts to support an inference, and "a given state of facts may give rise to two or more inferences, and in such case one inference is not built upon another but each is drawn separately from the same facts." *McDougall v. Glenn Cartage*

15.

*Co.,* 169 Ohio St. 522, 160 N.E.2d 266 (1959), paragraph two of the syllabus. In contrast, an inference based solely on another inference, without additional supporting facts, "is an inference on an inference and may not be indulged by a jury." *Hurt v. Charles J. Rogers Transp. Co.,* 164 Ohio St. 329, 130 N.E.2d 820 (1955), paragraph one of the syllabus.

{¶ 46} As previously noted, the only disputed element at trial was the identity of the murderer. In arguing the jury impermissibly stacked inferences to conclude that he was the murderer, appellant points to no inference that lacked supporting evidence or testimony. Instead, appellant argues that the circumstantial evidence was not direct evidence, or did not directly prove identity, and the circumstantial evidence also did not eliminate other possible suspects like his son, Bryan. In response, the state references authority that rejects the notion that evidence must be "irreconcilable with any reasonable theory of innocence to support a conviction." *See Jenks,* 61 Ohio St.3d at 259, 574 N.E.2d 492 at paragraph one of the syllabus. The state's position is the correct one.

{¶ 47} In this case, appellant does not argue that the state failed to present evidence of identity. He only argues that the state's evidence, implicating him, only implicated him by inference because it was merely circumstantial evidence that might also have implicated others. In essence, appellant argues the state's evidence was insufficient because there might have been better, direct evidence had such evidence been discovered by police. This argument does not address the sufficiency standard, however, requiring acquittal where the state's evidence, construed in its favor, would not support a

16.

"rational trier of fact" in finding "the essential elements of the crime proven beyond a reasonable doubt." *Walker,* 2021-Ohio-3860, 180 N.E.3d 60 at ¶ 63, quoting *Smith,* 80 Ohio St.3d at 113, 684 N.E.2d 668.

{¶ 48} Here, the state produced adequate evidence to support the verdict. Furthermore, while the bulk of the state's case consisted of circumstantial evidence, "[i]n some instances certain facts can only be established by circumstantial evidence." *Jenks,* 61 Ohio St.3d at 272, 574 N.EE.2d 482. There is no requirement "that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt." *Id.* Thus, the prosecution may rely on circumstantial evidence "to prove an element of the offense charged." *Id.* Because the state presented evidence as to identity, appellant's challenge to the sufficiency of the evidence, based solely on the character of the evidence, lacks merit.

{¶ 49} Appellant next argues that the verdict was against the manifest weight of the evidence. Unlike the adequacy consideration undertaken within a sufficiency inquiry, a challenge to the manifest weight addresses whether the state carried its burden of persuasion. *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 ("'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion").

{¶ 50} Appellant argues the manifest weight of the evidence does not support conviction because the jury "did not fully consider all the evidence" in finding him guilty of the charges, choosing to believe testimony from E.S.'s sister that E.S. planned to leave

17.

appellant, while disregarding E.S.'s later statements to appellant – as relayed by appellant – and E.S.'s messages to her brother-in-law canceling her trip to Kentucky, which appellant claims demonstrated that he and E.S. had reconciled. Appellant further argued that the jury disregarded his testimony that his lack of emotion was cultural and not indicative of guilt, and that the jury failed to "give proper weight to the fact that [appellant] did not flee to Mexico, that no knife or firearm was ever recovered, that no bloody clothing was found in appellant's possession and that no bloody footprints were found at the crime scene" or that appellant's phone and vehicle contained no incriminating evidence. Finally, appellant argues that the jury failed to credit appellant's explanation for his DNA all over E.S.'s body, that "they made love on the morning of August 16th" and failed to consider his son Bryan as a suspect based on the fact Bryan also lived at the home and arrived at work much later than appellant on the morning E.S. was found dead.

{¶ 51} Each of appellant's arguments articulate disagreement with the jury's resolution of the state's evidence with his own, contrary testimony. However, in weighing the evidence, we "must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Id.,* quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3 (additional citation omitted.).

18.

{¶ 52} In this case, the state presented evidence demonstrating appellant was controlling and abusive toward E.S., and E.S. was unhappy in her relationship with appellant. According to the testimony, E.S. made plans to leave appellant and take her children to Kentucky to stay with her brother and his husband. This was supported by testimony of E.S.'s sister, her brother-in-law, and her former pastor, who testified that E.S. contacted him just before the murder and asked for a ride to Kentucky. Appellant's DNA was the only foreign DNA identified on E.S.s body, he admitted to being with her before her death, and appellant sought to collect on E.S.'s life insurance policy soon after the funeral. E.S.'s family members also testified that appellant showed no emotion after E.S.'s death or at her funeral.

{¶ 53} As to appellant's claim that Bryan committed the murder, the state presented evidence demonstrating Bryan had no apparent motive. Bryan had only a working relationship with E.S. and no demonstrated conflict with her, and the investigation indicated the attack began in appellant's bedroom and Bryan's DNA was not found on E.S.'s body.

{¶ 54} Based on our thorough review of the record, we find nothing to support appellant's contention that the jury lost its way in finding him guilty of murder with a gun specification. While the evidence was mostly circumstantial, the state nevertheless met its burden of persuasion in demonstrating that appellant was responsible for killing E.S. by firing a bullet in her back and then stabbing her 18 times after she tried to leave him. "[A]ll that is required of the jury is that it weigh all of the evidence, direct and

19.

circumstantial, against the standard of proof beyond a reasonable doubt. Nothing more should be required of the factfinder." (Citation omitted) *Jenks,* 61 Ohio St.3d at 272, 574 N.E.2d 492.

{¶ 55} In this case, appellant failed to demonstrate that the jury lost its way in choosing "between competing constructions of the evidence." *Jenks* at 273. The law did not require the state's evidence to eliminate "any reasonable theory of innocence in order to support a conviction." (Citation omitted) *Id.* Accordingly, appellant's challenge to the weight of the evidence fails.

{¶ 56} We therefore find appellant's first and second assignments of error not well-taken.

### IV. Conclusion

{¶ 57} Having found substantial justice has been done, we affirm the judgment of the Lucas County Court of Common Pleas. Appellant shall pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.    _____
               JUDGE

Thomas J. Osowik, J.

Gene A. Zmuda, J.     _____
CONCUR.            JUDGE

            _____
            JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.