[No. 37830-9-I. Division One. January 13, 1997.]

THE STATE OF WASHINGTON, *Respondent,* v. JASON P. SHELLEY, *Appellant.*

*Robert L. Wilson* and *Karr Tuttle Campbell,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Lisa M. Marchese, Deputy,* for respondent.

GROSSE, J. — During a rough basketball game, Jason

Shelley struck another player and broke his jaw in three places. He was convicted of assault in the second degree after the State successfully argued to the jury that Shelley intentionally punched the other player. On appeal, Shelley claims that he was entitled to argue that the victim consented to the possibility of injury when he decided to play pickup basketball. While we agree that consent may be a defense to assault in athletic competitions, Shelley has failed to establish a factual basis for that defense. Further, while we hold that the consent defense is not limited to conduct within the rules of the games, rather it is to the conduct and harm that are the reasonably foreseeable hazards of joint participation in an athletic contest, we conclude that Shelley's conduct was not a reasonably foreseeable hazard.

On March 31, 1993, Jason Shelley and Mario Gonzalez played "pickup" basketball on opposing teams at the University of Washington Intramural Activities Building (the IMA). Pickup games are not refereed by an official; rather, the players take responsibility for calling their own fouls. During the course of three games, Gonzalez fouled Shelley several times. Gonzalez had a reputation for playing overly aggressive defense at the IMA. Toward the end of the evening, after trying to hit the ball away from Shelley, he scratched Shelley's face, and drew blood. After getting scratched, Shelley briefly left the game and then returned.

Shelley and Gonzalez have differing versions of what occurred after Shelley returned to the game. According to Gonzalez, while he was waiting for play in the game to return to Gonzalez's side of the court, Shelley suddenly hit him. Gonzalez did not see Shelley punch him. According to Shelley's version of events, when Shelley rejoined the game, he was running down the court and he saw Gonzalez make "a move towards me as if he was maybe going to prevent me from getting the ball." The move was with his hand up "across my vision." Angry, he "just reacted" and swung. He said he hit him because he was

afraid of being hurt, like the previous scratch. He testified that Gonzalez continually beat him up during the game by fouling him hard.

A week after the incident, a school police detective interviewed Shelley and prepared a statement for Shelley to sign based on the interview. Shelley reported to the police that Gonzalez had been "continually slapping and scratching him" during the game. Shelley "had been getting mad" at Gonzalez and the scratch on Shelley's face was the "final straw." As the two were running down the court side by side, "I swung my right hand around and hit him with my fist on the right side of his face." Shelley asserted that he also told the detective that Gonzalez waved a hand at him just before throwing the punch and that he told the detective that he was afraid of being injured.

Gonzalez required emergency surgery to repair his jaw. Broken in three places, it was wired shut for six weeks. His treating physician believed that a "significant" blow caused the damage.

During the course of the trial, defense counsel told the court he intended to propose a jury instruction that: "A person legally consents to conduct that causes or threatens bodily harm if the conduct and the harm are reasonably foreseeable hazards of joint participation in a lawful, athletic contest or competitive sport." Although the trial court agreed that there were risks involved in sports, it stated that "the risk of being intentionally punched by another player is one that I don't think we ever do assume." The court noted, "In basketball . . . you consent to a certain amount of rough contact. If they were both going for a rebound and Mr. Shelley's elbow or even his fist hit Mr. Gonzalez as they were both jumping for the rebound and Mr. Gonzalez'[s] jaw was fractured in exactly the same way . . . then you would have an issue." Reasoning that "our laws are intended to uphold the public peace and regulate behavior of individuals," the court ruled "that as a matter of law, consent cannot be a defense to an assault." The court indicated that Shelley could not claim

consent because his conduct "exceed[ed] what is considered within the rules of that particular sport[:]"

> [C]onsent is to contact that is contemplated within the rules of the game and that is incidental to the furtherance of the goals of that particular game.
>
> If you can show me any rule book for basketball at any level that says an intentional punch to the face in some way is a part of the game, then I would take another — second look at your argument. I don't believe any such rule book exists.

Later Shelley proposed jury instructions on the subject of consent:

> An act is not an assault, if it is done with the consent of the person alleged to be assaulted.
>
> It is a defense to a charge of second degree assault occurring in the course of an athletic contest if the conduct and the harm are reasonably foreseeable hazards of joint participation in a lawful athletic contest or competitive sport.

The trial court rejected these and Shelley excepted. The trial court did instruct the jury about self-defense.

### Consent

■ First, we hold that consent is a defense to an assault occurring during an athletic contest. This is consistent with the law of assault as it has developed in Washington. A person is guilty of second degree assault if he or she "[i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm."[1] One common law definition of assault recognized in Washington is " 'an unlawful touching with criminal intent.' "[2] At the common law, a touching is unlawful when the person touched did not

---

[1] RCW 9A.36.021(1)(a).

[2] *State v. Wilson*, 125 Wn.2d 212, 217-18, 883 P.2d 320 (1994) (quoting *State v. Bland*, 71 Wn. App. 345, 353, 860 P.2d 1046 (1993)).

give consent to it, and was either harmful or offensive.[3] As our Supreme Court stated in *State v. Simmons,* " 'where there is consent, there is no assault.' "[4] The State argues that because *Simmons* was a sexual assault case, the defense consent should be limited to that realm. We decline to apply the defense so narrowly. Logically, consent must be an issue in sporting events because a person participates in a game knowing that it will involve potentially offensive contact and with this consent the "touchings" involved are not "unlawful."[5]

Our review of the cases and commentary on the issue of consent reveals that although the defense of consent is applied in the realm of sexual assault, it has been sparingly applied by the courts in other areas.[6] The rationale that courts offer in limiting it is that society has an interest in punishing assaults as breaches of the public peace and order, so that an individual cannot consent to a wrong that is committed against the public peace.[7] Urging us to reject the defense of consent because an assault violates the public peace, the State argues that this principle precludes Shelley from being entitled to argue the consent defense on the facts of his case. In making this argument, the State ignores the factual contexts that dictated the results in the cases it cites in support.

When faced with the question of whether to accept a

[3]*State v. Garcia,* 20 Wn. App. 401, 403-04, 579 P.2d 1034 (1978) (citing ROLLIN M. PERKINS, CRIMINAL LAW § 2.A.1, at 107-08 (2d ed. 1969)). *See also* WPIC 35.50; 13A ROYCE A. FERGUSON, JR. & SETH A. FINE, WASHINGTON PRACTICE, *Criminal Law* § 404, at 49 (1990).

[4]*State v. Simmons,* 59 Wn.2d 381, 388, 368 P.2d 378 (1962) (quoting *Guarro v. United States,* 237 F.2d 578, 581 (D.C. Cir. 1956)).

[5]*See* 2 WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 7.15(e), at 311-12 (1986).

[6]MODEL PENAL CODE AND COMMENTARIES pt. 1, § 2.11 cmt. 2, at 396 (Official Draft & Revised Comments 1995); 2 WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 7.15(e), at 311-12 (1986); 1 PAUL H. ROBINSON, CRIMINAL LAW DEFENSES §§ 23, 106(b) (1984); W.E. SHIPLEY, Annotation, *Assault and Battery—Consent as Defense,* 58 A.L.R.3D 662, 664 (1974).

[7]*See State v. Brown,* 143 N.J. Super. 571, 364 A.2d 27, 28 (1976).

school child's consent to hazing[8] or consent to a fight,[9] or a gang member's consent to a beating,[10] courts have declined to apply the defense. Obviously, these cases present "touchings" factually distinct from "touchings" occurring in athletic competitions.

If consent cannot be a defense to assault, then most athletic contests would need to be banned because many involve "invasions of one's physical integrity."[11] Because society has chosen to foster sports competitions, players necessarily must be able to consent to physical contact and other players must be able to rely on that consent when playing the game. This is the view adopted by the drafters of the MODEL PENAL CODE:

> There are, however, situations in which consent to bodily injury should be recognized as a defense to crime . . . . There is . . . the obvious case of participation in an athletic contest or competitive sport, where the nature of the enterprise often involves risk of serious injury. Here, the social judgment that permits the contest to flourish necessarily involves the companion judgment that reasonably foreseeable hazards can be consented to by virtue of participation.[12]

The more difficult question is the proper standard by which to judge whether a person consented to the particular conduct at issue.

The State argues that "when the conduct in question is not within the rules of a given sport, a victim cannot be deemed to have consented to this act." The trial court apparently agreed with this approach. Although we recog-

---

[8]*People v. Lenti*, 44 Misc. 2d 118, 253 N.Y.S.2d 9 (1964).

[9]*People v. Lucky*, 45 Cal. 3d 259, 753 P.2d 1052, 247 Cal. Rptr. 1 (1988), *cert. denied*, 488 U.S. 1034 (1989); *State v. Hatfield*, 218 Neb. 470, 356 N.W.2d 872, 876 (1984).

[10]*Helton v. State*, 624 N.E.2d 499, 514 (Ind. Ct. App. 1993).

[11]*Cf. Helton*, 624 N.E.2d at 514 & n.23.

[12]MODEL PENAL CODE *supra*, § 2.11 cmt. 2, at 396 (footnotes omitted).

nize that there is authority supporting this approach,[13] we reject a reliance on the rules of the games as too limiting. ROLLIN M. PERKINS, CRIMINAL Law explains:

> The test is not necessarily whether the blow exceeds the conduct allowed by the rules of the game. Certain excesses and inconveniences are to be expected beyond the formal rules of the game. It may be ordinary and expected conduct for minor assaults to occur. However, intentional excesses beyond those reasonably contemplated in the sport are not justified.[14]

Instead, we adopt the approach of the MODEL PENAL CODE which provides that:

> (2) Consent to Bodily Injury. When conduct is charged to constitute an offense because it causes or threatens bodily injury, consent to such conduct or to the infliction of such injury is a defense if:
>
> . . . .
>
> b) the conduct and the injury are reasonably foreseeable hazards of joint participation in a lawful athletic contest or competitive sport or other concerted activity not forbidden by law.[15]

The State argues the law does not allow "the victim to 'consent' to a broken jaw simply by participating in an unrefereed, informal basketball game." This argument presupposes that the harm suffered dictates whether the defense is available or not. This is not the correct inquiry.

The correct inquiry is whether the conduct of defendant constituted foreseeable behavior in the play of the game. Additionally, the injury must have occurred as a by-

---

[13]*People v. Lucky*, 753 P.2d at 1072 (dicta); WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., CRIMINAL LAW §§ 57, 81, at 408, 608 (1972).

[14]ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW, at 154 (3d ed. 1982) (citing *Regina v. Watson*, 26 CCC 2nd 150 (Prov. Ct. Ont. 1975) (upholding conviction of hockey player who pursued an opponent and beat him with fists)).

[15]MODEL PENAL CODE *supra*, § 2.11, at 393. *See* 1 PAUL H. ROBINSON, CRIMINAL LAW DEFENSES § 23, at 80 & n.13 (1984) and statutes cited therein; ROBINSON *supra*, § 106(b), at 520.

product of the game itself. In construing a similar statutory defense, the Iowa court required a "nexus between defendant's acts and playing the game of basketball."[16] In *State v. Floyd*, a fight broke out during a basketball game and the defendant, who was on the sidelines, punched and severely injured several opposing team members. Because neither defendant nor his victims were voluntarily participating in the game, the defense did not apply because the statute "contemplated a person who commits acts during the course of play, and the exception seeks to protect those whose acts otherwise subject to prosecution are committed in furtherance of the object of the sport."[17] As the court noted in *Floyd*, there is a "continuum, or sliding scale, grounded in the circumstances under which voluntary participants engage in sport . . . which governs the type of incidents in which an individual volunteers (*i.e.*, consents) to participate[.]"[18]

The New York courts provide another example. In a football game, while tackling the defendant, the victim hit the defendant. After the play was over and all of the players got off the defendant, the defendant punched the victim in the eye. The court in *People v. Freer* held that this act was not consented to:

> Initially it may be assumed that the very first punch thrown by the complainant in the course of the tackle was consented to by defendant. The act of tackling an opponent in the course of a football game may often involve "contact" that could easily be interpreted to be a "punch". Defendant's response after the pileup to complainant's initial act of "aggression" cannot be mistaken. Clearly, defendant intended to punch complainant. This was not a consented to act.

*People v. Freer*, 86 Misc. 2d 280, 381 N.Y.S.2d 976, 978 (1976).

As a corollary to the consent defense, the State may

---

[16]*State v. Floyd*, 466 N.W.2d 919, 922 (Iowa Ct. App. 1990).

[17]466 N.W.2d at 922.

[18]466 N.W.2d at 923 n.3.

argue that the defendant's conduct exceeded behavior foreseeable in the game. Although in "all sports players consent to many risks, hazards and blows," there is "a limit to the magnitude and dangerousness of a blow to which another is deemed to consent."[19] This limit, like the foreseeability of the risks, is determined by presenting evidence to the jury about the nature of the game, the participants' expectations, the location where the game has been played, as well as the rules of the game.

Here, taking Shelley's version of the events as true, the magnitude and dangerousness of Shelley's actions were beyond the limit. There is no question that Shelley lashed out at Gonzalez with sufficient force to land a substantial blow to the jaw, and there is no question but that Shelley intended to hit Gonzalez. There is nothing in the game of basketball, or even rugby or hockey, that would permit consent as a defense to such conduct. Shelley admitted to an assault and was not precluded from arguing that the assault justified self-defense; but justification and consent are not the same inquiry.

 Related to his consent argument, Shelley claims that the assault statute[20] is vague when applied to sports altercations because it fails to provide either adequate notice of proscribed conduct, or standards to prevent arbitrary enforcement as to athletes who believe they can be rough because they are accustomed to unprosecuted rough play. A statute is void for vagueness if it either "does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed" or if it fails to "provide ascertainable standards of guilt to protect against arbitrary enforcement."[21] Because his claim does not implicate any First Amendment rights, Shelley cannot claim the statute is

---

[19]*Freer*, 381 N.Y.S.2d at 978.

[20]RCW 9A.36.021(1)(a).

[21]*City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990); *State v. Halstien*, 122 Wn.2d 109, 117, 857 P.2d 270 (1993).

facially vague; he may argue only that it is vague as applied to him.[22]

▮ Our holding that a defendant is entitled to argue that another player may legally consent to conduct that causes or threatens bodily harm if the conduct and the harm are reasonably foreseeable hazards of joint participation in a lawful, athletic contest or competitive sport cures any problem with vagueness. With this defense, an ordinary person should understand that intentionally punching a person in an athletic competition may result in criminal prosecution. Accordingly, the crime is defined with sufficient definiteness.[23] Additionally, the statute did not invite arbitrary enforcement by law enforcement on the facts of this case given that breaking another's jaw in three places satisfies the substantial bodily harm element of RCW 9A.36.021(1)(a).

We affirm.

A majority of the panel having determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

WEBSTER and COX, JJ., concur.

Reconsideration denied February 14, 1997.

Review denied at 133 Wn.2d 1010 (1997).

[22]*State v. Stark*, 66 Wn. App. 423, 832 P.2d 109 (1992).

[23]*Cf. City of Seattle v. Taylor*, 50 Wn. App. 384, 388, 748 P.2d 693 ("The concept of offensive touching is well rooted, and persons of ordinary understanding from the early days of the common law to the present have understood its meaning."), *review denied*, 110 Wn.2d 1036 (1988).