

DA 06-0728

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 297

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

JASON TYLER MACKRILL,

        Defendant and Appellant.

APPEAL FROM:     District Court of the Sixth Judicial District,
In and For the County of Park, Cause No. DC-2005-099
Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Jim Wheelis, Chief Appellate Defender, David Avery, Assistant Appellate
Defender, Helena, Montana

       For Appellee:

           Hon. Mike McGrath, Montana Attorney General, John Paulson, Assistant
Attorney General, Helena, Montana

           Brett Linneweber, Park County Attorney, Livingston, Montana

Submitted on Briefs:  October 24, 2007

Decided:  August 20, 2008

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Jason Tyler Mackrill appeals from his conviction in the District Court for the Sixth Judicial District, Park County, of aggravated assault.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2     Mackrill visited a number of bars in Livingston, Montana, during the evening of October 23, 2005.  He entered the Whiskey Creek Saloon at around 9:30.  The bartender, Lori Munro, observed that he appeared to be intoxicated.  According to Munro, Mackrill staggered around the bar for awhile and then walked up to two patrons, ordered a drink for one, and turned to the other and began to pick a fight.  At that point, Munro ordered Mackrill to leave, and he did so.  Roughly an hour later, Mackrill poked his head in the door of the bar but then turned around and left.

¶3     A similar scenario occurred at the Murray Bar.  The bartender, Christina Gillespie, observed that Mackrill was intoxicated, and Mackrill indicated to Gillespie that he did not know where he was.  Gillespie refused to serve Mackrill alcohol and instead gave him a glass of water and told him that he could sober up there for a little while.  According to Gillespie, Mackrill initially was polite, but he eventually began "misbehaving" and became upset that Gillespie would not serve him alcohol.  Mackrill walked up to a woman sitting at the bar and got into an argument with her.  Gillespie asked the woman if Mackrill was bothering her, and the woman replied that he was.  So, Gillespie asked Mackrill to leave.  Mackrill later returned to the bar, insisting that he had left his jacket there, but Gillespie informed him that there was no jacket in the bar and that she would

2

call the police if he entered again. Mackrill lingered outside the bar for awhile peering through the window.

¶4     Mackrill also visited the Mint Bar two or three times that evening, where he eventually got into the altercation at issue in this case. According to Dan Connelley, a patron at the Mint Bar who noticed Mackrill during these visits, Mackrill was "beyond intoxication" and was trying to pick fights. Mackrill was asked to leave the bar at around 7:30, and he did so; but when he returned at around midnight and the bartender, Kaylene Little, asked him to leave, Mackrill became obstinate and argumentative. In Connelley's view, Mackrill "just wouldn't comprehend that it was time for him to leave" and "that they were going to call the cops."

¶5     Mackrill eventually approached Connelley, who had been chatting with a friend, Robert Gluesing. Mackrill positioned himself between Connelley and Gluesing and asked Connelley for a drink. Gluesing offered Mackrill a couple of dollars and suggested that he get a drink someplace else, since Little was unwilling to serve him. At this point, Little again ordered Mackrill to leave; and when he refused to do so, she picked up the phone to call the police. Gluesing attempted to persuade Mackrill to leave, but Gluesing ended up escorting Mackrill out the door.

¶6     Meanwhile, Jeremy Shields, the operator of the Sport Bar located half a block from the Mint Bar, was standing outside of the Sport Bar talking on the phone when he observed two men (Mackrill and Gluesing) exit the Mint Bar. Shields observed that "they had their hands on each other" and that "it looked like there was a scuffle going on." Shields called two of his friends in the Sport Bar, Nate Ousley and Jory Mitchell, to

3

come out and witness the commotion. Shields saw Mackrill, whom Shields characterized as "larger" and "thicker" than Gluesing, hit Gluesing several times, including a "very solid shot" that caused Gluesing's feet to come off the ground and the back of his head to hit the pavement. According to Shields, the sound of Gluesing's head hitting the pavement "sounded like a pumpkin breaking." Mitchell noted that prior to the final punch, Gluesing's hands were down and he was basically "sleeping on his feet." After Gluesing hit the ground, Mitchell contacted 911 to report the incident.

¶7 Livingston City Fire and Rescue responded to the scene and found Gluesing unconscious in the street. Gluesing was bleeding from the back of his head and from his right ear and was unresponsive. He was transported to Livingston Memorial Hospital, where he was treated for head injuries, including a skull fracture. Gluesing's blood-alcohol concentration was .246. He remained in the hospital for about a week to receive treatment for his injuries.

¶8 Livingston Police Department Officers Jerry Harmon and Joseph Harris also responded to the emergency call. After arriving at the scene, they checked on Gluesing's condition and gathered information about the assailant from witnesses. Officer Harris then set out to search for Mackrill. Harris eventually made contact with Mackrill and observed that although he was able to give his name, date of birth, and social security number, Mackrill appeared to be highly intoxicated and confused. Harris placed Mackrill under arrest and transported him to the police station, where the officers conducted a voluntary videotaped interview with Mackrill.

¶9 On November 17, 2005, the State charged Mackrill with one count of aggravated assault, a felony, in violation of § 45-5-202, MCA. Mackrill pleaded not guilty to the charge. Thereafter, he filed a Notice of Affirmative Defenses, in which he stated that he would be arguing consent at trial (i.e., that Gluesing had consented to the fight and that Mackrill, therefore, was not guilty of the charge).

¶10 Trial commenced on April 13, 2006. Following opening statements, defense counsel made a motion to exclude any questions or testimony regarding the fact that Mackrill had been asked to leave several of the bars he visited on October 23, 2005, due to disorderly conduct. Counsel argued that such evidence would be prejudicial and that it was inadmissible under M. R. Evid. 404(b). The prosecutor responded that evidence of the events which occurred before, during, and after the offense was committed was relevant and admissible under the transaction rule. *See* § 26-1-103, MCA. The court agreed with the State and denied Mackrill's motion, explaining: "I think it's part of res gestae, which is a transaction rule, both before and after." The court also indicated, albeit not explicitly, that the evidence was not unfairly prejudicial.

¶11 Mackrill's trial proceeded, and the jury heard testimony from several witnesses, including Connelley, Gluesing, and a number of the bartenders on duty the evening of October 23. On the second day of trial, the issue arose as to whether the State could introduce the videotape of Mackrill being interviewed at the police station after his arrest. Mackrill objected "to any presentation, whatsoever," of the video on the grounds that its prejudicial value outweighed its probative value and that it was cumulative of earlier testimony. The District Court agreed that portions of the taped interview were unduly

prejudicial. Thus, the court ordered the prosecution to edit out any references to Mackrill's criminal record, tattoos, and violent tendencies. The prosecutor edited the tape and then moved to admit it at trial, at which point Mackrill reiterated his objection that the video was cumulative. The court overruled the objection.

¶12 The jury ultimately found Mackrill guilty as charged. Thereafter, Mackrill filed a post-trial motion requesting that the court, pursuant to § 46-16-702, MCA, "find him not guilty of Aggravated Assault, or in the alternative, guilty of the lesser included offense of Misdemeanor Assault." Mackrill argued that the State had "failed to introduce evidence upon which the jury could conclude that Robert Gluesing did not consent to the October 24, 2005 bar fight" and had "failed to introduce evidence upon which the jury could conclude that Robert Gluesing, by reason of intoxication, was unable to make a reasonable judgment as to the nature or harmfulness of the bar fight." The District Court held a hearing and denied the motion. The court reasoned that the jury had been properly instructed on the law and had heard the facts and that the court was not permitted under the circumstances to substitute its judgment for that of the jury. Mackrill now appeals.

**ISSUES**

¶13 We restate the issues on appeal as follows:

1. Did the District Court err in denying Mackrill's motion for a new trial?

2. Did the District Court err in admitting evidence concerning Mackrill's conduct before and after the altercation with Gluesing?

3. Does Mackrill's conviction violate due process?

**DISCUSSION**

¶14    *Issue 1.  Did the District Court err in denying Mackrill's motion for a new trial?*

**Mackrill's Contentions**

¶15    We begin with Mackrill's sufficiency-of-the-evidence claim, as it provides context for our discussion of the evidentiary issues under Issue 2.  As noted, Mackrill filed a post-trial motion contending that the State had failed to present evidence sufficient to prove two matters:  (1) that Gluesing did not consent to the assault, and (2) that Gluesing, by reason of intoxication, was unable to make a reasonable judgment as to the nature or harmfulness of the assault.  Mackrill asked the District Court either to find him not guilty of aggravated assault or to find him guilty of the lesser offense of misdemeanor assault.

¶16    We note that Mackrill captioned his motion as one for "judgment notwithstanding the verdict."  On appeal, he refers to the motion as one for a "directed verdict" and also as one for "an acquittal notwithstanding the verdict."  Montana's statutes governing criminal procedure, however, do not recognize these motions.  *See State v. McWilliams*, 2008 MT 59, ¶¶ 36, 41, 341 Mont. 517, ¶¶ 36, 41, 178 P.3d 121, ¶¶ 36, 41.  Indeed, we have clarified that a "motion for judgment notwithstanding the verdict" is properly referred to as a "motion for a new trial" under § 46-16-702, MCA.  *See McWilliams*, ¶ 41; *State v. Bell*, 277 Mont. 482, 485, 923 P.2d 524, 526 (1996).  Likewise, we have clarified that a "motion for a directed verdict" is properly referred to as a "motion to dismiss for insufficient evidence" under § 46-16-403, MCA.  *See McWilliams*, ¶ 36; *State v. Rosling*, 2008 MT 62, ¶ 21 n. 2, 342 Mont. 1, ¶ 21 n. 2, 180 P.3d 1102, ¶ 21 n. 2.  The latter motion (to dismiss for insufficient evidence) is made "at the close of the prosecution's evidence or at the close of all the evidence."  Section 46-16-403, MCA.  Thus, this statute

7

and motion are not applicable here. Rather, we deem Mackrill's motion, which was made following the jury's verdict, to be one for a new trial under § 46-16-702, MCA. Indeed, he cited this statute in the motion. And we once again urge the bench and bar to use the correct terminology. *McWilliams*, ¶ 36 n. 1; *Rosling*, ¶ 21 n. 2.

¶17 Section 46-16-702, MCA, provides as follows:

> (1) Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice. A new trial may be ordered by the court without a motion or may be granted after motion and hearing.
> (2) The motion for a new trial must be in writing and must specify the grounds for a new trial. The motion must be filed by the defendant within 30 days following a verdict or finding of guilty and be served upon the prosecution.
> (3) On hearing the motion for a new trial, if justified by law and the weight of the evidence, the court may:
> (a) deny the motion;
> (b) grant a new trial; or
> (c) modify or change the verdict or finding by finding the defendant guilty of a lesser included offense or finding the defendant not guilty.

¶18 Mackrill contends on appeal that "there was insufficient evidence that Gluesing did not consent to fight Mr. Mackrill, and there was ample evidence that he did consent to fight Mr. Mackrill." Thus, according to Mackrill, the District Court should have granted him a new trial or entered a finding of not guilty. Section 46-16-702(3)(b), (c), MCA.

**Standard of Review**

¶19 Where a motion for a new trial under § 46-16-702, MCA, is based on sufficiency of the evidence, we review the grant or denial of the motion de novo. *See McWilliams*, ¶ 42 n. 2; *State v. Swann*, 2007 MT 126, ¶ 19, 337 Mont. 326, ¶ 19, 160 P.3d 511, ¶ 19.

**Analysis**

¶20 At the outset, we observe that Mackrill's sufficiency-of-the-evidence argument is somewhat perplexing. Mackrill states in his opening brief that the issue here "is essentially a sufficiency of the evidence argument regarding the issue of consent." As noted, he claims that "there was insufficient evidence that Gluesing did not consent to fight Mr. Mackrill." Yet, the statute under which he was prosecuted states as follows: "A person commits the offense of aggravated assault if the person purposely or knowingly causes serious bodily injury to another." Section 45-5-202(1), MCA (2005). Nothing in this statute requires the State, in order to convict an individual of aggravated assault, to prove that the victim did not consent to fight the defendant. Moreover, Mackrill does not contend that there was insufficient evidence upon which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt, i.e., that he "purposely or knowingly cause[d] serious bodily injury to [Gluesing]." Section 45-5-202(1), MCA. Thus, the sufficiency-of-the-evidence question here is not whether the State failed to prove the elements of the offense.

¶21 Rather, in his reply brief, Mackrill articulates the pertinent question as follows: "[T]his Court should consider whether no rational jury could have found that a preponderance of the evidence demonstrated that Gluesing failed to consent to fight Mr. Mackrill." Mackrill goes on to argue that "the preponderance of the evidence was that Gluesing consented to fight Mr. Mackrill." It appears, therefore, that Mackrill's claim is this: Consent is an affirmative defense which, if proven by a preponderance of the evidence, "precludes" a conviction for aggravated assault; Mackrill proved by a

9

preponderance of the evidence that Gluesing consented to the assault; thus, no rational jury could have found him guilty of the charge.

¶22 To address this argument, we begin with the consent statute. Under § 45-2-211(1), MCA, "[t]he consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense." Under § 45-2-211(2), MCA, however, consent is ineffective if:

> (a) it is given by a person who is legally incompetent to authorize the conduct charged to constitute the offense;
> (b) it is given by a person who by reason of youth, mental disease or defect, or intoxication is unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged to constitute the offense;
> (c) it is induced by force, duress, or deception; or
> (d) it is against public policy to permit the conduct or the resulting harm, even though consented to.

¶23 Recognizing that Gluesing was intoxicated on the night in question and that consent is ineffective if it was given by "a person who by reason of . . . intoxication is unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged to constitute the offense," § 45-2-211(2)(b), MCA, Mackrill argues that he proved, by a preponderance of the evidence, "that [Gluesing] was not too intoxicated to decide whether to agree to fight Mr. Mackrill." This argument, however, assumes a critical issue that must be determined as a threshold matter—namely, whether § 45-2-211(1), MCA, applies to Mackrill's offense, i.e., whether consent is a defense to the charge of aggravated assault. In this regard, the State suggests that § 45-2-211(2)(d), MCA, "arguably removes consent as a defense to charges arising from assaultive conduct, even by mutual combat, on a public street in downtown Livingston." For the

10

reasons which follow, we agree that it is against public policy to permit a person purposely or knowingly to cause serious bodily injury to another, even though that conduct and the resulting harm were consented to. Section 45-2-211(2)(d), MCA.

¶24 While this Court has not previously considered whether a person can consent to be the victim of an assault, "the great weight of authority disfavors the defense of consent in assault cases." *State v. Baxter*, 141 P.3d 92, ¶ 25 (Wash. App. Div. 2 2006). In *Baxter*, the court observed that "[i]n determining whether consent is a defense in a criminal case, the courts have considered the particular act, the surrounding circumstances, and society's interest in the activity involved." *Baxter*, ¶ 22. The court pointed out, for instance, that consent was not a defense to the violation of a domestic-violence protection order in *State v. Dejarlais*, 969 P.2d 90 (Wash. 1998), since the public has an interest in preventing domestic violence; that consent was not a defense to a game of shooting BB guns at each other in *State v. Hiott*, 987 P.2d 135 (Wash. App. Div. 2 1999), since the game was not a generally accepted athletic contest and was against public policy; and that consent was not a defense to punching another player during a basketball game in *State v. Shelley*, 929 P.2d 489 (Wash. App. Div. 1 1997), where the contact was not foreseeable behavior in the play of the game. *See Baxter*, ¶ 22.

¶25 Likewise, in *Hiott*, the court observed that "a child cannot consent to hazing, a gang member cannot consent to an initiation beating, and an individual cannot consent to being shot with a pistol," since such activities are "against public policy" and since "criminal statutes are enacted to protect citizens and to prevent breaches of the public peace." *Hiott*, 987 P.2d at 136-37 (citing *People v. Lenti*, 253 N.Y.S.2d 9, 15 (1964),

11

*Helton v. State*, 624 N.E.2d 499, 514 (Ind. App. 1 Dist. 1993), and *State v. Fransua*, 510 P.2d 106, 107 (N.M. App. 1973)).  Similarly, in *Shelley*, the court observed that "although the defense of consent is applied in the realm of sexual assault, it has been sparingly applied by the courts in other areas," since "society has an interest in punishing assaults as breaches of the public peace and order."  *Shelley*, 929 P.2d at 491-92.

¶26     In *Fransua*, the New Mexico Court of Appeals confronted the following factual scenario, which is not too far removed from Mackrill's version of what transpired between him and Gluesing in the case at hand:

> On March 3, 1972 both defendant and the victim were in a bar in Albuquerque.  Defendant had apparently been drinking heavily that day and the previous day.  Sometime around 3:00 p.m. after an argument, defendant made a statement to the victim to the effect that if he (defendant) had a gun, he would shoot the victim.  The victim then left the bar, went to his own automobile, removed a loaded pistol from the automobile and returned to the bar.  He approached the defendant, laid the pistol on the bar and made the following statement:  "I told him (defendant) that there was the gun, that if he wanted to shoot me to go ahead."  Defendant then picked up the pistol, put the barrel next to the victim's head and pulled the trigger, wounding him seriously.

*Fransua*, 510 P.2d at 107.

¶27     The defendant asserted that the actions of the victim in procuring the weapon and inviting the defendant to shoot him constituted consent to the shooting and, as such, a defense to the crime of aggravated battery.  The court rejected this contention, explaining as follows:

> It is generally conceded that a state enacts criminal statutes making certain violent acts crimes for at least two reasons:  One reason is to protect the persons of its citizens; the second, however, is to prevent a breach of the public peace.  While we entertain little sympathy for either the victim's absurd actions or the defendant's equally unjustified act of pulling the

12

trigger, we will not permit the defense of consent to be raised in such cases. Whether or not the victims of crimes have so little regard for their own safety as to request injury, the public has a stronger and overriding interest in preventing and prohibiting acts such as these.

*Fransua*, 510 P.2d at 107 (citation omitted). The court thus held that consent is not a defense to the crime of aggravated battery, irrespective of whether the victim invites the act and consents to the battery. *Fransua*, 510 P.2d at 107.

¶28 An equally "absurd" situation was presented in *State v. Brown*, 364 A.2d 27 (N.J. Super. L. Div. 1976):

[D]efendant contends that he is not guilty of the alleged atrocious assault and battery because he and Mrs. Brown, the victim, had an understanding to the effect that if she consumed any alcoholic beverages (and/or became intoxicated), he would punish her by physically assaulting her. The testimony revealed that the victim was an alcoholic. On the day of the alleged crime she indulged in some spirits, apparently to Mr. Brown's dissatisfaction. As per their agreement, defendant sought to punish Mrs. Brown by severely beating her with his hands and other objects.

*Brown*, 364 A.2d at 28.

¶29 In considering this contention, the court first noted that the defense of consent implicates broader interests in the criminal context than it does in the civil context:

While criminal law is designed to protect the interests of society as a whole, the civil law is concerned with enforcing the rights of each individual within the society. So, while the consent of the victim may relieve defendant of liability in tort, this same consent has been held irrelevant in a criminal prosecution, where there is more at stake than a victim's rights.

*Brown*, 364 A.2d at 28. Also at stake, the court observed, is the public interest in peace, health, and good order; and an individual cannot consent to a wrong that is committed against the public peace. *Brown*, 364 A.2d at 29. Although the defendant's acts (the physical assaults upon Mrs. Brown) may have been done in private, the court reasoned

13

that they had "an impingement (whether direct or indirect) upon the community at large in that the very doing of them may tend to encourage their repetition and so to undermine public morals." *Brown*, 364 A.2d at 29. Moreover, the court reasoned that "the State has an interest in protecting those persons who invite, consent to and permit others to assault and batter them. Not to enforce these laws which are geared to protect such people would seriously threaten the dignity, peace, health and security of our society." *Brown*, 364 A.2d at 32.

¶30 The court ultimately held that "no one has the right to beat another even though that person may ask for it." *Brown*, 364 A.2d at 31, *aff'd, State v. Brown*, 381 A.2d 1231, 1232 (N.J. Super. App. Div. 1977) (per curiam). Notably, in reaching this conclusion, the court observed that

> street fighting which is disorderly and mischievous on many obvious grounds (even if for a purse and consented to), and encounters of that kind which tend to and have the specific objective of causing bodily harm, serve no useful purpose, but rather tend to breach the peace and thus are unlawful. No one is justified in striking another, except it be in self defense, and similarly whenever two persons go out to strike each other and do so, each is guilty of an assault. It is no matter who strikes the first blow, for the law proscribes such striking.

*Brown*, 364 A.2d at 30 (citations omitted); *accord State v. Weber*, 155 P.3d 947, ¶ 21 (Wash. App. Div. 3 2007) ("There is nothing redeeming or valuable in permitting fighting and every reason to dissuade it.").

¶31 The court in *State v. Dunham*, 693 N.E.2d 1175 (Ohio App. 1 Dist. 1997) (per curiam), expressed a similar view, holding that

> where, as here, two persons agree to fight each other not in conformity with statutes authorizing boxing matches, each may be held guilty of assault, and

14

> where, as here, the harm visited upon one of the fighters constitutes serious physical harm, the fact that the fight was begun by mutual consent is not a defense, in law, to a charge brought pursuant to [the felonious-assault statute].

*Dunham*, 693 N.E.2d at 1179. The court was not persuaded by the defendant's theory that "where two people engage in . . . a mutually agreed-upon fistfight, neither can claim that an assault and battery has been committed upon him, i.e., neither possesses a criminal intent when battering his opponent." *Dunham*, 693 N.E.2d at 1177-78. The court stated plainly that "[t]he fact that street fighters agree to engage in a public brawl to settle old or current differences cannot and does not negate the penal consequences." *Dunham*, 693 N.E.2d at 1178.

¶32 There are numerous other cases supporting the foregoing principles.[1] Having

---

[1] *See e.g. Durr v. State*, 722 So.2d 134, ¶¶ 7-8 (Miss. 1998) (adopting the reasoning of *Fransua*); *Jaske v. State*, 539 N.E.2d 14, 18 (Ind. 1989) (same); *Lyons v. State*, 437 So.2d 711, 712 (Fla. App. 1 Dist. 1983) (same); *State v. Weber*, 155 P.3d 947, ¶¶ 20-21 (Wash. App. Div. 3 2007) (holding that consent was not a defense to the charge of second-degree assault between two inmates, since public policy "strongly disfavors permitting prison violence" and since it would be impossible for those operating correctional facilities to maintain the health and safety of the prisoners if inmates were permitted to engage in physical violence under the rationale that they had agreed to fight); *State v. George*, 937 S.W.2d 251, 256 (Mo. App. E. Dist. 1996) (consent defense did not apply to defendant-patient's intentional assault of two hospital security guards, since "allowing the consent statute to legalize intentional assaults would thwart the purpose of Missouri's statutes criminalizing assaultive behavior"); *People v. Reckers*, 623 N.E.2d 811, 814 (Ill. App. 4 Dist. 1993) ("[W]e are inclined to agree with the commentators and a number of our sister States who found consent not to be a defense to a battery based on injurious touching."); *Ramey v. State*, 417 S.E.2d 699, 702 (Ga. App. 1992) (Johnson, J., concurring specially) ("[T]he suggestion that consent could be considered a defense to the type of prolonged, sadistic and gratuitous violence at issue here [hitting the victim with a flashlight and burning him with a cigarette] must, in the final analysis, be viewed as completely ludicrous."); *People v. Lucky*, 753 P.2d 1052, 1072 (Cal. 1988) ("Voluntary mutual combat outside the rules of sport is a breach of the peace, mutual consent is no justification, and both participants are guilty of criminal assault."); *State v.*

considered these cases and the reasoning of the authorities discussed above, we conclude

that it is against public policy to permit a person purposely or knowingly to cause serious

bodily injury to another, even though that conduct and the resulting harm were consented

to.  Sections 45-5-202(1), 45-2-211(2)(d), MCA.  We agree that criminal statutes are

generally intended to protect citizens and to prevent breaches of the public peace, *Hiott*,

987 P.2d at 136-37, and that interpreting the consent statute as legalizing mutually

agreed-upon aggravated assaults would thwart the purpose of the aggravated-assault

statute, *George*, 937 S.W.2d at 256.  We also agree that society has an interest in

punishing aggravated assaults as breaches of the public peace, health, and good order,

*Shelley*, 929 P.2d at 491-92; *Brown*, 364 A.2d at 29, and that whether or not the victim of

an aggravated assault consented to the defendant's causing him serious bodily injury, the

public has an overriding interest in preventing such acts, *Fransua*, 510 P.2d at 107.  In

particular, we recognize that this type of conduct not only puts the combatants at risk, but

also jeopardizes the safety of the police, emergency personnel, and bystanders.  It also

consumes public resources and imposes on society various costs, such as medical

---

*Hatfield*, 356 N.W.2d 872, 876 (Neb. 1984) ("Although there is authority to the contrary, in dealing with a criminal charge all attempts to do physical violence which amount to a statutory assault are unlawful and a breach of the peace, and a person cannot consent to an unlawful assault."); *Taylor v. State*, 133 A.2d 414, 415 (Md. 1957) ("A criminal assault which tends to bring about a breach of the public peace is treated as a crime against the public generally, and therefore the consent of the victim is no defense."); *Wright v. Starr*, 179 P. 877, 877-78 (Nev. 1919) ("In a criminal prosecution for assault and battery, consent to a beating is no defense; the reason being that a wrong is committed against the public peace."); *State v. Roby*, 74 A. 638, 641 (Vt. 1909) ("[T]hough one consents to be beaten, it is no justification when it is a matter that concerns the peace and dignity of the state."); *see also* W. E. Shipley, *Consent as Defense to Charge of Criminal Assault and Battery*, 58 A.L.R.3d 662 (1974 & Supp. 2008).

16

expenses and the inability of individuals to feel safe and secure in their persons.

¶33   While recognizing consent as a defense (§ 45-2-211(1), MCA), the Legislature contemplated that consent would be ineffective if it were "against public policy to permit the conduct or the resulting harm, even though consented to" (§ 45-2-211(2)(d), MCA). We hold, for the public-policy reasons discussed above, that consent of the victim is not a defense to the charge of aggravated assault under § 45-5-202(1), MCA.[2]

¶34   Given this holding, Mackrill's arguments—that the jury was bound to acquit him because he proved by a preponderance of the evidence that Gluesing consented to fight him and was not too intoxicated to give legal consent—are moot. Even if Gluesing consented to engaging in "mutual combat" with Mackrill resulting in serious bodily injury, that consent was ineffective. Section 45-2-211(2)(d), MCA. Accordingly, we affirm the District Court's order denying Mackrill's motion for a new trial.

¶35   ***Issue 2. Did the District Court err in admitting evidence concerning Mackrill's conduct before and after the altercation with Gluesing?***

**Mackrill's Claim**

¶36   Mackrill contends that the District Court erroneously allowed the State to present (1) testimony that he was, as Mackrill puts it, "disorderly, rude, and/or confrontational,"

---

[2] Our holding here pertains to the defense of consent. It does not pertain to self-defense, which permits a person to use force against another under specific circumstances. *See* § 45-3-102, MCA ("A person is justified in the use of force . . . against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or another or to prevent the commission of a forcible felony."). Our holding also does not pertain to conduct authorized and regulated by the State within the context of a "combative event." *See* Title 23, chapter 3, MCA.

as well as "obnoxious, obstreperous, and even verbally confrontational," in other nearby bars during the hours before the incident with Gluesing, and (2) the videotape of Mackrill being interviewed at the police station after his arrest, which showed his "aggressive demeanor." Mackrill contends that the only reason the prosecution wanted to present this evidence was to show that Mackrill "was so aggressive that he must have wanted to fight," i.e., he "was predisposed to commit assault outside the Mint." Mackrill argues that "[s]uch evidence was totally unnecessary, as Mr. Mackrill did not contest that he was an active participant in the fight with Gluesing." Rather, according to Mackrill, "[t]he real issue was whether Gluesing was also a willing fighter," and evidence regarding Mackrill's "earlier disorderliness" and his "post-arrest aggressiveness" was not needed to determine this issue. Mackrill challenges the admission of the evidence on two grounds: first, he asserts that the ground relied on by the District Court—the transaction rule—was mistaken; and second, he asserts that the evidence was "overly prejudicial" under M. R. Evid. 403.

## Standard of Review

¶37 We generally review a district court's evidentiary rulings for an abuse of discretion. *State v. McOmber*, 2007 MT 340, ¶ 10, 340 Mont. 262, ¶ 10, 173 P.3d 690, ¶ 10. A district court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *McOmber*, ¶ 10. Notwithstanding this deferential standard, however, judicial discretion must be guided by the rules and principles of law; thus, our standard of review is plenary

to the extent that a discretionary ruling is based on a conclusion of law. *McOmber*, ¶ 10; *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, ¶ 17, 134 P.3d 45, ¶ 17.

**Analysis**

¶38 First, given our holding under Issue 1, we disagree with Mackrill that "[t]he real issue was whether Gluesing was also a willing fighter." That was not an issue at all, since consent is not a defense to aggravated assault. Rather, the issue was whether Mackrill "purposely or knowingly cause[d] serious bodily injury to [Gluesing]." Section 45-5-202(1), MCA (2005).

¶39 Second, we also disagree with Mackrill's contention that the testimony regarding his conduct at the other bars and the videotape of his post-arrest interview were not admissible under the transaction rule. M. R. Evid. 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith" but that such evidence "may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In order for evidence of other crimes, wrongs, or acts to be admissible, the requirements set out in *State v. Matt*, 249 Mont. 136, 142-43, 814 P.2d 52, 56 (1991), must be satisfied. One of those requirements is that the prosecution must give the defendant written notice that such evidence is to be introduced. *Matt*, 249 Mont. at 142-43, 814 P.2d at 56; *see also State v. Bieber*, 2007 MT 262, ¶ 56, 339 Mont. 309, ¶ 56, 170 P.3d 444, ¶ 56 ("As a safeguard we require that evidence of other crimes may not be received unless proper notice has been provided to the defendant of the State's intent to use such evidence and the State has indicated the

purpose for which the evidence will be introduced." (citing *State v. Just*, 184 Mont. 262, 268, 602 P.2d 957, 960-61 (1979)). Mackrill points out—and the State concedes—that the prosecution did not give notice that it would be introducing Rule 404(b) evidence.

¶40 The State points out, however, that the notice requirements of *Matt* and *Just* do not apply to evidence of matters which are inextricably linked to, and explanatory of, the charged offense. Indeed, there is a distinction between Rule 404(b) "other crimes" evidence and evidence of a defendant's misconduct which is inseparably related to the alleged criminal act. *State v. Lozon*, 2004 MT 34, ¶ 12, 320 Mont. 26, ¶ 12, 85 P.3d 753, ¶ 12. Furthermore, we have said that evidence which " 'tends to explain circumstances surrounding the charged offense' " is relevant, probative, and competent. *Lozon*, ¶ 12 (quoting *State v. Wing*, 264 Mont. 215, 225, 870 P.2d 1368, 1374 (1994)). Thus, where the evidence at issue "is not wholly independent or unrelated to the charged offense," it is not "other crimes" evidence, and the prosecution is not required to comply with the notice requirements of *Just* and *Matt*. *Lozon*, ¶ 12.

¶41 We have associated this rule with § 26-1-103, MCA, which states as follows: "Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." *See e.g. State v. Buck*, 2006 MT 81, ¶ 76, 331 Mont. 517, ¶ 76, 134 P.3d 53, ¶ 76; *State v. Gittens*, 2008 MT 55, ¶ 37, 341 Mont. 450, ¶ 37, 178 P.3d 91, ¶ 37. Pursuant to the "transaction rule," evidence of matters that are "inextricably linked to, and explanatory of, the charged offense" is admissible notwithstanding the rules relating to "other crimes" evidence. *Lozon*, ¶ 12; *Gittens*, ¶ 37.

20

¶42 Mackrill acknowledges that the evidence regarding his "earlier bar wanderings" and his demeanor after being arrested "might have been explanatory of whether Mr. Mackrill purposely or knowingly fought with Gluesing, which was undisputed." But he maintains that the evidence "was not inextricably linked to the charged offense." We disagree. Evidence of Mackrill's disorderly and "obstreperous" conduct at the various Livingston bars during the course of the evening in question was in fact closely related to the charged aggravated assault on Gluesing and was explanatory of the circumstances surrounding that offense. *Cf. Lozon*, ¶ 13; *Buck*, ¶ 79; *Gittens*, ¶ 39. In particular, this evidence helped to explain Mackrill's unruly and confrontational behavior in the Mint Bar and his aggression against Gluesing.

¶43 Admissibility under the transaction rule is predicated on the jury's right to hear what transgressed immediately prior and subsequent to the commission of the offense charged, so that the jurors may evaluate the evidence in the context in which the criminal act occurred. *State v. Detonancour*, 2001 MT 213, ¶ 29, 306 Mont. 389, ¶ 29, 34 P.3d 487, ¶ 29. But while the timing of the events is relevant to admissibility under the transaction rule, it is not determinative. *Cf. State v. Marshall*, 2007 MT 198, ¶ 20, 338 Mont. 395, ¶ 20, 165 P.3d 1129, ¶ 20 (holding that the defendant's prior acts of grooming the victim, which occurred a month or two before the transaction at issue, satisfied the transaction rule). Here, we are not persuaded by Mackrill's contention that the events which occurred at the other bars during the few hours before the assault and at the police station shortly after the assault were not sufficiently contemporaneous with the assault itself. Accordingly, we hold that the challenged evidence was admissible under the

21

transaction rule. The District Court did not err or abuse its discretion in admitting this evidence pursuant to § 26-1-103, MCA.

¶44 Lastly, with respect to Mackrill's contention that the testimony regarding his conduct at the other bars and the videotape of his post-arrest interview were overly prejudicial, M. R. Evid. 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Mackrill, however, has not explained why, in his view, the probative value of the challenged evidence was "substantially outweighed by the danger of unfair prejudice." He makes a number of conclusory assertions in this regard, but these are not sufficient to sustain his burden of showing error by the District Court. *See State v. Bailey*, 2004 MT 87, ¶ 26, 320 Mont. 501, ¶ 26, 87 P.3d 1032, ¶ 26 ("It is the appellant's burden to establish error by a district court . . . ."); *State v. Miller*, 2008 MT 106, ¶ 15, 342 Mont. 355, ¶ 15, 181 P.3d 625, ¶ 15 (observing that conclusory assertions are "a wholly inadequate presentation of an issue to this Court"). Thus, we affirm the District Court on this matter as well.

¶45 *Issue 3. Does Mackrill's conviction violate due process?*

¶46 Mackrill asserts that his conviction violates due process because he was too intoxicated to consent to fight Gluesing. More specifically, Mackrill contends that if the victim's intoxication can nullify a defendant's otherwise-viable consent defense (§ 45-2-211(2)(b), MCA), then the defendant's intoxication should be able to nullify his guilt for the charged conduct. Yet, the latter is precluded by statute. *See* § 45-2-203,

MCA ("A person who is in an intoxicated condition is criminally responsible for his conduct and an intoxicated condition is not a defense to any offense and may not be taken into consideration in determining the existence of a mental state which is an element of the offense unless the defendant proves that he did not know that it was an intoxicating substance when he consumed, smoked, sniffed, injected, or otherwise ingested the substance causing the condition."). Mackrill claims this scheme violates his right to due process.

¶47 Mackrill's argument fails on two grounds. First, per our analysis under Issue 1, the defense of consent was not available to Mackrill in the first place. Second, Mackrill did not raise his due process claim in the District Court; and as a general rule, this Court will not address an issue raised for the first time on appeal. *State v. Adgerson*, 2003 MT 284, ¶ 12, 318 Mont. 22, ¶ 12, 78 P.3d 850, ¶ 12.

¶48 An exception to this general rule is our common-law doctrine of plain error review. Under this doctrine, this Court

> may discretionarily review a claimed error that implicates a criminal defendant's fundamental constitutional rights—even if a timely objection was not made in the trial court, and notwithstanding the inapplicability of the criteria set forth in § 46-20-701(2), MCA—where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process.

*State v. Rosling*, 2008 MT 62, ¶ 77, 342 Mont. 1, ¶ 77, 180 P.3d 1102, ¶ 77 (citations omitted). We use our inherent power of common-law plain error review sparingly, on a case-by-case basis, and only in the aforementioned circumstances. *Rosling*, ¶ 77.

¶49 Mackrill has failed to demonstrate that his due process claim meets the elements of plain error review. He simply states that the elements were satisfied, without any supporting analysis. This is utterly insufficient under M. R. App. P. 12(1)f. to present an issue to this Court. Accordingly, we will not consider this claim any further.

## CONCLUSION

¶50 We hold that the defense of consent is inapplicable to a charge of aggravated assault. We further hold that the District Court did not err or abuse its discretion in admitting testimony regarding Mackrill's conduct at the other bars on the night in question and the videotape of his post-arrest interview.

¶51 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JIM RICE